Tonya J. KAELIN, Appellant,

v.

Robert KAELIN, Respondent.

No. 74201.

Missouri Court of Appeals,
Eastern District,
Division One.

April 6, 1999.

Gartenberg & Kline, P.C., Lee G. Kline, Clayton, for appellant.

Byron Cohen, Clayton, for respondent.

JAMES A. PUDLOWSKI, Presiding Judge.

Robert Kaelin (Robert) and Tonya Kaelin (Tonya) were married on 7 July 1978, and their marriage was dissolved on 31 October 1995. At the time of the dissolution, the trial court ordered Robert to pay $300 monthly to Tonya as maintenance, subject to modification, and to pay for Tonya's health insurance premiums under COBRA for 24 months beginning in November 1995. The trial court amended its judgment on 30 January 1996 by increasing the maintenance payment to $500 monthly.

Tonya filed a Motion for Contempt against Robert on 27 May 1997 alleging he failed and refused to pay the COBRA premiums for 24 months and she thereby incurred medical expenses. On 3 July 1997, Tonya also filed a Motion to Modify Judgment and Decree of Dissolution of Marriage seeking an increase in the amount of maintenance she received. On 10 September 1997, Robert filed a Cross–Motion to Modify seeking the elimination or a reduction of his maintenance obligation to Tonya. The trial court heard all of these motions on 27 January 1998.

The evidence adduced at trial follows: Robert has been employed as an autoworker at Chrysler Corporation since, and prior to, the time of the marriage dissolution. Robert did not receive a copy of the dissolution decree until after the court imposed date of 1 November 1995 for Robert to make payments for COBRA benefits for Tonya. However, Robert contacted his union benefits representative to request an application form for Tonya when he received the judgment. Under Robert's health insurance plan, Tonya received automatic coverage for November 1995. Robert received the COBRA application form from Blue Cross Blue Shield of Michigan (BCBS), his health care provider, in December 1995. Robert completed the applicable portions of the form in December 1995. He then gave it to Tonya for her to complete her personal information, address of where premiums were to be sent, and forward the application to BCBS.

Robert did not receive premium statements from BCBS for COBRA coverage during November 1995 through January 1996. When Robert contacted BCBS to investigate why he did not receive the premium statements, BCBS informed him that it would not discuss the matter with him because it involved Tonya's heath insurance coverage. BCBS refused to violate Tonya's privacy rights by disclosure of this information.

In February 1996, Robert contacted his attorney regarding not paying the health insurance premiums. Robert expressed concern that he was not in compliance with the dissolution decree. Robert's attorney contacted Tonya's attorney via letter on 6 February.[1] Neither Robert nor his attorney received a reply.

In April 1996, Robert received a health insurance premium notice from Tonya for her COBRA coverage. The premium statement was for $217.77 for the month of March 1996. Tonya also forwarded the statement for April coverage. Robert's attorney received a letter from Tonya's attorney dated 23 April 1996[2] requesting Robert to make

---

1. This letter stated:

In December, 1995 Robert Kaelin mailed to Tonya Kaelin the paperwork he had received to permit Tonya to have health insurance through COBRA. My client completed as much of the form as he was capable of doing.

My client had not heard whether or not your client has completed the form and returned it to the necessary party. In the event your client does not complete the form within the required time, then she may not be eligible for COBRA insurance.

2. This letter read in part:

Our client has indicated that she has been receiving all the correspondence from Blue Cross and Blue Shield of Michigan regarding the continuation of her coverage under COBRA. Mr. Kaelin has not made the payment to insure that the insurance will be covered and if payment is

the COBRA payment. Robert then sent payment via overnight delivery to BCBS.

Robert received the May 1996 statement from Tonya. Tonya wrote on the May 1996 statement, "just got this, but after this, it will be sent to you." Robert paid the May 1996 premium. His attorney then received a letter from Tonya's attorney dated 24 May 1996 which stated in part:

> I have been informed by my client that her insurance has been canceled because of non-support payment. Mr. Kaelin needs to make up the premiums since the date of the dissolution which amounts to approximately $1,300.00. Ms. Kaelin has provided me with the phone number for the office which he needs to contact to make arrangements for payment.

Robert's attorney replied to the letter on 29 May 1996 stating that Robert had filled in all applicable paperwork, paid all premiums he received, and requested all unpaid premium statements.

Tonya contacted BCBS in April or May 1996 requesting that premium statements be sent directly to Robert rather than to her as she indicated in the original COBRA application. For June and July 1996, Robert received premium statements directly from BCBS. Robert paid these premiums. However, following the July 1996 statement, Robert did not receive further statements from BCBS or Tonya. Accordingly, Robert made no further payments. Robert later received a check from BCBS dated 10 May 1996 and payable to Tonya in the amount of $217.77. He forwarded this check to her.

Tonya received a letter from BCBS, dated 20 June 1996, informing her that her COBRA health insurance coverage ended in November 1995. Tonya received two refund checks, one from Robert and one from BCBS. Robert contacted BCBS in an attempt to get coverage reinstated; however, BCBS refused to violate Tonya's privacy by discussing this matter with Robert.

Tonya testified that at the time of the dissolution, she was not employed. However, since the dissolution, she is employed by Faithful Servants where she cleans homes. Some of the homes Tonya cleans are two-story homes and she often works on both levels and the basements. She works at least 30 hours each week and is paid on a commission. In 1997, Tonya earned in excess of $10,000.

Tonya stated that she has needed arthroscopic surgery on both of her knees since before the dissolution of her marriage in October 1995. However, Tonya did not consult with a doctor who recommended the surgery until November 1997. She further stated she incurred $4,537.70 in medical and prescription charges; yet, she was unable to distinguish the portion of these expenses incurred prior to the dissolution. Tonya did not know the portion of medical expenses that would have been covered if she would have had the surgery under her COBRA health insurance. Tonya testified that she had sufficient funds to cover the cost of the surgery, but that she chose not to spend the money.

Tonya met Michael Cunningham (Cunningham) in January 1996, and in March 1996, they moved into the residence at 6529 Barbarton. Tonya maintains they are not romantically involved. Together, they purchased the residence for $113,000. Tonya gave Cunningham $50,000 for the down-payment of the residence, but her name was not placed on the deed. In May 1997, the home loan was refinanced and Tonya's name was added to the deed as a co-tenant with the right of survivorship. Additionally, Tonya contributes $400 per month to the mortgage payment which is less than $800 per month and assists in the payment of utility bills.

Cunningham testified that he is employed by St. Louis Auto Radiator. He further stated that in addition to the $400 per month mortgage contribution, Tonya pays him $600 to $700 per month to assist with groceries, insurance and taxes.

not made prior to May 2, 1996 in the amount of $217.77, coverage will not be available to her. Please confirm that Mr. Kaelin has made this payment and that Ms. Kaelin is covered by health insurance. Thank you for your assistance in this regard.

In May 1997, Tonya exchanged her 1991 Chrysler Eagle Talon, receiving a trade-in value of $5,000, for a 1997 Jeep Cherokee which she titled in Cunningham's name[3]. Tonya learned in June 1996 that she no longer had COBRA health insurance, but decided not to file her Motion for Contempt until 27 May 1997 because she didn't want to spend money on attorney's fees.

Robert's gross income in 1997 was $88,056. This was approximately $17,000 less than his income at the time of the dissolution. The pay reduction was due to an involuntary reduction in the amount of overtime and regular hours Robert worked at Chrysler. Robert has remarried and helps support his stepchild. Currently, his monthly gross income is approximately $3,870 and his monthly expenses are $3,243.93. Robert's expenses exceed his income by approximately $1,720 per month after taxes are withheld. In order to pay his expenses, Robert uses the insurance settlement his current wife received upon the death of her former husband.

Following the close of this evidence, the trial court denied Tonya's Motion for Contempt and granted Robert's Motion to Modify by reducing his maintenance obligation to $300 monthly. The trial court also ordered Robert and Tonya to pay their own attorney's fees.

We will sustain the judgment of the trial court unless it is not supported by substantial evidence, whether it is against the weight of the evidence, or whether the court has erroneously declared or applied the law. Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976); Rule 73.01(c). We accept as true all evidence and reasonable inferences which are favorable to the trial court's judgment and disregard all contrary evidence. Lemmon v. Lemmon, 958 S.W.2d 601, 603 (Mo.App. W.D.1998); Butts v. Butts, 906 S.W.2d 859, 861 (Mo.App. S.D.1995). We defer to the trial court's decisions even if the evidence could support a different conclusion. Bradley v. Bradley, 880 S.W.2d 376, 379 (Mo. App. W.D.1994).

■ In her first point on appeal, Tonya argues that the trial court erred by not holding Robert in contempt for failure to maintain her COBRA health insurance because Robert acknowledged that he knew of his obligation, but voluntarily terminated Tonya's coverage and did not add Tonya under his COBRA rights until after the window of opportunity to enlist expired.

■ We will not reverse the trial court's judgment regarding a motion for civil contempt unless the trial court abused its discretion. In re Marriage of Mayfield, 780 S.W.2d 139, 144 (Mo.App. S.D.1989); Fugitt v. Fugitt, 850 S.W.2d 396, 399 (Mo.App. S.D. 1993). For the trial court to hold Robert in contempt, it must be convinced that he was financially able to make the required payments or that he intentionally and contumaciously placed himself in a position so that he could not comply with the trial court's judgment. State ex rel. Stanhope v. Pratt, 533 S.W.2d 567, 575 (Mo. banc 1976). "A marriage dissolution court has the duty to protect its orders and punishment for noncompliance is discretionary." Escobedo v. Escobedo, 686 S.W.2d 52, 53 (Mo.App. E.D. 1985). Upon review of the trial court's findings, we hold that the trial court did not abuse its discretion in denying Tonya's Motion for Contempt against Robert.

Robert obtained and filled out the applicable paperwork. He gave the COBRA application to Tonya in the requisite period of time for her to enroll under his health insurance plan. Robert failed to receive any premium statements for Tonya until March 1996. However, in the intervening time, he was concerned in complying with the trial court's judgment and contacted his attorney. Robert attempted to contact BCBS directly, but BCBS was not able to discuss Tonya's coverage with him. When Robert did receive premium statements, he promptly paid them including one overnight express mail delivery to ensure Tonya's coverage would not lapse. There is no evidence that Robert intentionally or contumaciously acted in such a way to deny Tonya COBRA benefits. We find no abuse of the trial court's discretion.

---

**3.** The trial court noted in its judgment that Tonya testified in her deposition that she deposited the $5000 from the trade-in value of the car into her savings account.

In her second point on appeal, Tonya alleges the trial court's judgment misapplied the law by reducing her monthly maintenance payments because Robert failed to meet his burden of showing a substantial and continuing change in circumstances. We disagree.

Maintenance is subject to modification "only upon the showing of a change of circumstances so substantial and continuing as to make the terms unreasonable...." Section 452.370.1 RSMo (1994). The burden to sustain the modification is on the party seeking to modify. *Bradley*, 880 S.W.2d at 379.

Tonya cites to numerous cases reiterating the general rule that neither a voluntary decrease in the obligor's income nor an increase in the obligee's income will justify a modification of maintenance standing alone. Zalmanoff v. Zalmanoff, 862 S.W.2d 941, 946 (Mo.App. E.D.1993). She believes that Robert failed to prove that his diminished salary was not voluntary. "Missouri courts have consistently held that a voluntary loss of employment is not substantial and continuing change of circumstance such as to allow modification." Leslie v. Leslie, 827 S.W.2d 180, 183 (Mo. banc 1992). However, Tonya ignores evidence that Robert's salary at the time of dissolution was supplemented by overtime work at the Chrysler plant. Robert was informed by a plant manager that overtime at the plant was being reduced for all employees. Therefore, there was evidence of a substantial and continuing involuntary change in Robert's income.

Tonya further argues that Robert is able to meet his financial obligations and that she has not accumulated any assets since their divorce. This argument is without merit. The trial court explicitly found that Robert's monthly expenses exceeded his monthly net income and that to meet these obligations, he uses his current wife's savings.

Additionally, Tonya is now the co-tenant of a home. She pays more than half of the monthly mortgage payments, contributes to the monthly expenses, and provided the only down-payment. Tonya also traded-in a vehicle received from the dissolution and titled the new vehicle in Cunningham's name; thus, relinquishing any interest in it.

Tonya maintains that she should not be forced to consume her share of marital property to be entitled to or to retain her maintenance award citing Witt v. Witt, 930 S.W.2d 500, 503 (Mo.App. W.D.1996). ("It is well-settled that a spouse is not required to deplete his or her portion of marital assets for living expenses before being entitled to maintenance.")

In *Witt*, the husband sought to avoid paying maintenance to his wife prior to their original dissolution decree by arguing that his wife could support herself from the income in her IRA. The court rejected this argument. The wife was not of an age to withdraw these funds without penalty. The court stated that in the initial determination of maintenance, it was not proper to include the wife's *potential* monthly and annual investment income. We find the analogy misplaced.

In the instant case, Robert seeks a modification of the maintenance award and does not ask the court to consider Tonya's potential income. Tonya's actual income increased since her employment with Faithful Servants, and she is able to contribute money to her living situation with Cunningham. Robert's actual income has decreased and he depends on his new wife for additional support to meet his obligations. An involuntary decrease in Robert's salary and an improvement in Tonya's financial situation are factors which are proper in determining if a maintenance modification is appropriate. Schoolcraft v. Schoolcraft, 869 S.W.2d 907, 909 (Mo.App. E.D.1994). Point denied.

In her final point on appeal, Tonya claims that the trial court abused its discretion in refusing to award her attorney fees. The distribution of attorney fees by the trial court is presumptively correct. Cohn v. Cohn, 841 S.W.2d 782, 787 (Mo.App. E.D. 1992). In determining the proper distribution, the trial court has broad discretion to award or deny attorney fees and its ruling will not be disturbed absent an abuse of discretion. Brock v. Brock, 936 S.W.2d 882, 888 (Mo.App. E.D.1997). In determining if there was an abuse of discretion, "the appel-

lant must show that the award was clearly against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice." *Lamont,* 922 S.W.2d at 86.

The trial court considered the financial situation of each party in its judgment. Tonya failed to demonstrate that this was clearly against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice. Point denied.

The judgment of the trial court is affirmed.

WILLIAM H. CRANDALL, Jr., Judge, and CLIFFORD H. AHRENS, Judge, concur.