# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### February 2, 2005 Session

## MURFREESBORO MEDICAL CLINIC, P.A.  v.  DAVID UDOM

**Appeal by permission from the Court of Appeals, Middle Section**
**Chancery Court for Rutherford County**
**No. 02-5739CV      Hon. Robert E. Corlew, III, Chancellor**

---

**No. M2003-00313-SC-S09-CV - Filed June 29, 2005**

---

The issue presented in this case is whether a covenant not to compete is enforceable between a physician and his former employer, a private medical clinic.  The trial court concluded that the non-compete agreement was enforceable and enjoined the physician from establishing a medical practice at a location within the restricted area.  The Court of Appeals affirmed the trial court's decision that the non-compete agreement was enforceable, but reversed the grant of the temporary injunction and remanded the case to the trial court for further determinations with respect to the agreement's "buy-out" provision.  After a thorough review of the issues presented, including considerations of public policy, we reverse the Court of Appeals' judgment. We hold that except for those specifically prescribed by statute, physicians' covenants not to compete are unenforceable and void.

**Tenn. R. App. P. 11 Permission to Appeal; Judgment of the Court of Appeals is Reversed**

WILLIAM M. BARKER, J., delivered the opinion of the court, in which E. RILEY ANDERSON and ADOLPHO A. BIRCH, Jr., JJ., joined.  JANICE M. HOLDER, J., filed a concurring and dissenting opinion.  FRANK F. DROWOTA, III, C.J., not participating.

Douglas B. Janney, III, Nashville, Tennessee, for the appellant, David Udom.

Josh A. McCreary, Murfreesboro, Tennessee, for the appellee, Murfreesboro Medical Clinic, P.A.

## OPINION

## FACTUAL BACKGROUND

The plaintiff, Murfreesboro Medical Clinic (MMC), is a private medical practice in Murfreesboro, Tennessee, that employs more than fifty physicians.  In early 2000, MMC made an

offer of employment to the defendant, Dr. David Udom (Dr. Udom), to practice internal medicine at MMC. Dr. Udom verbally accepted the offer. To memorialize this agreement, MMC presented Dr. Udom with an "employment and stock transfer agreement" (the agreement) for his review and signature.

The agreement provided Dr. Udom with an initial two-year term of employment at MMC, with MMC having the option of extending the contract at the expiration of those two years. The agreement also contained a non-compete provision which stated:

> [u]pon any termination of this Agreement . . . , the Employee agrees not to engage in the practice of medicine within a twenty-five (25) mile radius of the public square of Murfreesboro, Tennessee for a period of eighteen (18) months following such termination.

The agreement further contained a "compensation for competition" provision, referred to by the parties as a "buy-out" clause. This buy-out clause provided that the non-compete restrictions cited above would be waived "upon the payment by the Employee to the Corporation of an amount equal to twelve times the most recent Initial Monthly Salary . . . and the reimbursement of the Corporation for any moving expenses paid to, or on behalf of, the Employee."

Dr. Udom reviewed the proposed agreement, signed it, and returned it to MMC on or about April 4, 2000. He began work on September 1, 2000, and practiced medicine in the Internal Medicine Department until August of 2002.

On August 13, 2002, as his initial two-year term of employment was about to expire, MMC advised Dr. Udom that it would not renew his contract and that August 31, 2002, would be his last day of employment. After being informed of MMC's decision, Dr. Udom met with Robert Hardy, MMC's Chief Executive Officer, who advised Dr. Udom that MMC would enforce the non-compete provision. In early September, Dr. Udom met with Dr. D. Scott Corlew, MMC's President and Chairman of the Board, to discuss whether the non-compete clause would allow Dr. Udom to become a hospitalist[1] at Middle Tennessee Medical Center (MTMC). He was told that taking a position as a hospitalist would be in breach of the non-compete provision, even though Dr. Udom would not be directly competing for patients with MMC. Dr. Udom was also told during this meeting that he could not accept a position at the Alvin C. York Veterans Administration Medical Center in Murfreesboro despite the fact that this facility did not directly compete for patients with MMC.[2] In addition, Dr. Udom was informed that the non-compete provision would require him to

---

[1] A hospitalist is a physician, usually an internist, who specializes in the care of hospitalized patients. The American Heritage Dictionary (4th ed. 2000). As a hospitalist, a physician treats patients who are already in the hospital, not patients who specifically seek out the physician.

[2] Veterans Administration hospitals are federally funded facilities that provide treatment only to persons meeting certain eligibility requirements. In general, a person must have been honorably discharged from military service

(continued...)

relinquish his admitting privileges at MTMC.

Dr. Udom states in an affidavit contained in the record that the covenant not to compete would preclude him from practicing medicine at all of the hospitals in the Murfreesboro area, including MTMC in Murfreesboro, Stone Crest Medical Center in Smyrna, Alvin C. York VA Medical Center in Murfreesboro and Summit Hospital in Nashville. It would also restrict him from practicing in several communities surrounding Murfreesboro, including La Vergne, Antioch, Brentwood, Shelbyville, Woodbury, Lascassas and Lebanon.

On October 10, 2002, Dr. Udom sent a letter to MMC, informing it of his intention to open a medical practice in Smyrna, Tennessee. In a second letter dated November 18, 2002, he reiterated his intent and also informed MMC that he did not intend to utilize the "buy-out" clause of the employment agreement.

On December 10, 2002, MMC filed a complaint against Dr. Udom seeking to enjoin him from violating the non-compete provision of his employment agreement. Following a hearing in chancery court on January 10, 2003, MMC was granted a temporary injunction enjoining Dr. Udom from establishing a medical practice in Smyrna, Tennessee, or engaging in the practice of medicine at MTMC in Murfreesboro, Tennessee. The court ordered MMC to file a $120,000.00 injunction bond and also permitted Dr. Udom to deposit $120,000.00 with the Clerk & Master's Office as satisfaction of the "buy-out" clause. In addition, Dr. Udom was granted permission to file a Rule 9 interlocutory appeal.

On February 19, 2003, Dr. Udom opened a solo practice in Smyrna, Tennessee. His office was approximately fifteen miles from the public square of Murfreesboro, Tennessee.

In the Court of Appeals, Dr. Udom argued that (1) the trial court erred in granting MMC the temporary injunction and (2) that the covenant not to compete is unenforceable because it is unreasonable in the circumstance, does not secure a protectable interest, is over-broad, and is against public policy. The Court of Appeals reversed the grant of the temporary injunction against Dr. Udom but affirmed the holding that the covenant not to compete was enforceable. The Court of Appeals remanded the case to the Chancery Court to determine "the reasonableness and specific amount to be used in satisfying the buy-out provision."

We granted Dr. Udom permission to appeal to determine whether the covenant not to compete is enforceable. The issue of whether covenants not to compete are enforceable against physicians is one of first impression for this Court.

---

2 (...continued)
to be eligible for treatment at a VA facility. In addition, length of service, nature of disability, income level and available VA resources also factor into what treatment is available. See 38 U.S.C.A. § 1710 (2003).

# ANALYSIS

Our review of the trial court's conclusions of law is de novo on the record with no presumption of correctness. Tenn. R. App. P. 13(d); Union Carbide Corp. v. Huddleston, 854 S.W.2d 87, 91 (Tenn. 1993). The trial court's findings of fact, however, are accompanied by a presumption of correctness, unless the evidence preponderates otherwise. Id.

MMC argues that it has a protectable business interest in retaining its patient base. MMC maintains that the covenant not to compete should be enforced because the unique one-on-one relationship between a physician and patient placed Dr. Udom in a heightened position to affect MMC's ability to retain its patients when he left. MMC further argues that it has a protectable business interest in the substantial resources it has expended in providing training, office space, administrative support and salary to Dr. Udom. In response, Dr. Udom argues that the covenant not to compete is unreasonable, overly broad, and against public policy.

## I. Covenants Not to Compete

In general, covenants not to compete are disfavored in Tennessee. See Hasty v. Rent-A-Driver, Inc., 671 S.W.2d 471, 472 (Tenn. 1984). These covenants are viewed as a restraint of trade, and as such, are construed strictly in favor of the employee. Id. However, if there is a legitimate business interest to be protected and the time and territorial limitations are reasonable then non-compete agreements are enforceable. Id. at 473. Factors relevant to whether a covenant is reasonable include: (1) the consideration supporting the covenant; (2) the threatened danger to the employer in the absence of the covenant; (3) the economic hardship imposed on the employee by the covenant; and (4) whether the covenant is inimical to the public interest. Id. at 472-73 (citing Allright Auto Parks, Inc. v. Berry, 409 S.W.2d 361, 363 (Tenn. 1966)). Also, the time and territorial limits must be no greater than necessary to protect the business interest of the employer. Allright Auto Parks, 409 S.W.2d at 363.

Covenants not to compete that implicate important public policy issues are even more strictly construed. See Spiegel v. Thomas, Mann & Smith, P.C., 811 S.W.2d 528, 529-30 (Tenn. 1991); Allright Auto Parks, 409 S.W.2d at 364; Med. Educ. Assistance Corp. v. State, 19 S.W.3d 803, 813 (Tenn. Ct. App. 1999). For example, in Spiegel, a law firm attempted to enforce the terms of a "deferred compensation agreement," which was in essence a non-compete agreement, against an attorney formerly employed by the firm. 811 S.W.2d at 529. This Court analyzed the validity of the agreement in terms of its impact on the public good. Id. at 530. Because "[c]oncern for the public good is inherent in the purposes" underlying the ethics rules governing the legal profession, we looked to the legal ethics rules to guide our analysis. Id. We noted the American Bar Association's position that restrictive covenants were unethical. Id. The ABA's Ethics Committee views the practice of law as unlike a common business or trade because lawyers deal with clients, not merchandise, and lawyers have a duty to make legal counsel available to the public. Id. We concluded that to enforce the clause in question would violate these ethical standards and therefore held the clause void as against public policy. Id. at 531.

-4-

## II.  Public Policy Considerations in Restrictions on the Practice of Medicine

Much like restrictive covenants in the practice of law, restrictive covenants in the medical profession raise concerns regarding the public good.  Having a greater number of physicians practicing in a community benefits the public by providing greater access to health care.  Increased competition for patients tends to improve quality of care and keep costs affordable.  Furthermore, a person has a right to choose his or her physician and to continue an on-going professional relationship with that physician.  See Med. Educ. Assistance Corp., 19 S.W.3d at 816; see also AMA Code of Medical Ethics § E-9.06 (1977).  Enforcing covenants not to compete against physicians could impair or even deny this right altogether.

Since 1980 the American Medical Association (AMA)[3] has taken the position that physicians' non-compete agreements impact negatively on health care and are not in the public interest.  See AMA Code of Medical Ethics § E-9.02 (1998).  Although stopping short of completely prohibiting covenants not to compete, the AMA strongly discourages them.  Id.  The AMA has maintained the view for the past twenty-five years that non-compete agreements "restrict competition, disrupt continuity of care, and potentially deprive the public of medical services."  Id.  The AMA has also found that a person's right to choose a physician and free competition among physicians are "prerequisites of ethical practice."  Id. at § E-9.06.

It is important to note that prior to 1980 the AMA took a more lenient stance towards physicians' non-compete agreements.  The official AMA position from 1960 until 1980 stated there was no ethical proscription against a "reasonable agreement not to practice within a certain area for a certain time, if it is knowingly made and understood."  AMA, Principles of Medical Ethics, Opinions and Reports of the Judicial Council 25 (1960).

Despite the AMA's stated position that non-compete agreements among physicians are not in the public interest, we find it curious that a majority of states continue to apply a reasonableness standard in evaluating non-compete agreements between physicians, similar to the evaluation of covenants in commercial contexts.  See, e.g., Canfield v. Spear, 254 N.E.2d 433 (Ill. 1969) (enforcing a covenant which prohibited a dermatologist from practicing within twenty-five miles of former employer);  Duneland Emergency Physician's Med. Group, P.C. v. Brunk, 723 N.E.2d 963 (Ind. Ct. App. 2000) (holding a covenant unenforceable upon concluding that employer had failed to show a protectable business interest);  Weber v. Tillman 913 P.2d 84 (Kan. 1996) (enforcing a covenant not to compete upon concluding its restrictions were reasonable); Cmty. Hosp. Group, Inc. v. More, 869 A.2d 884 (N.J. 2005) (enforcing with modifications a non-compete agreement upon determining that employer had a protectable business interest and restrictions were reasonable);  Karlin v. Weinberg, 390 A.2d 1161 (N.J. 1978) (enforcing a covenant not to compete against a

---

[3] The American Medical Association, founded in 1847, is the nation's largest association of physicians, advocating for the profession, physicians, and patients.  It was founded for the purpose of "scientific advancement, standards for medical education, launching a program of medical ethics, [and] improved public health."  See www.ama-assn.org/ama/pub/category/12982.html (Last updated March 10, 2005).

physician upon finding that the employer had a legitimate business interest in protecting patient relationships).  We note that the largest number of cases dealing with physician's covenants not to compete were decided prior to the AMA's adoption of its current ethical guidelines in 1980.  See, e.g., Odess v. Taylor, 211 So. 2d 805 (Ala. 1968); Canfield v. Spear, 254 N.E.2d 433 (Ill. 1969); Cogley Clinic v. Martini, 112 N.W.2d 678 (Iowa 1962); Lareau v. O'Nan, 355 S.W.2d 679 (Ky. 1962); Willman v. Beheler, 499 S.W.2d 770 (Mo. 1973); Ellis v. McDaniel, 596 P.2d 222 (Nev. 1979); Karlin v. Weinberg, 390 A.2d 1161 (N.J. 1978); Lovelace Clinic v. Murphy, 417 P.2d 450 (N.M. 1966); Gelder Med. Group v. Webber, 363 N.E.2d 573 (N.Y. 1977); New Castle Orthopedic Assoc. v. Burns, 392 A.2d 1383, (Pa. 1978); Oudenhoven v. Nishioka, 190 N.W.2d 920 (Wis. 1971).


We further find it most surprising that several of the jurisdictions to have addressed this issue since 1980 have placed little emphasis on the general ethical concerns cited by the AMA in discouraging physicians' non-compete agreements.  See Raymundo v. Hammond Clinic Ass'n, 449 N.E.2d 276, 280-81 (Ind. 1983) (dismissing as merely "self-serving" the argument that ethical considerations should prohibit enforcement of such covenants and offering no discussion of the AMA's stance on the issue.); see also Rash v. Toccoa Clinic Med. Assocs., 320 S.E.2d 170 (Ga. 1984); Duneland Emergency Physician's Med. Group, P.C., v. Brunk, 723 N.E. 2d 963 (Ind. Ct. App. 2000); Weber v. Tillman 913 P.2d 84 (Kan. 1996); Gant v. Hygeia Facilities Found. Inc., 384 S.E.2d 842 (W.Va. 1989).

Nevertheless, several states, emphasizing public policy concerns, have subjected these covenants to closer scrutiny than non-compete agreements in other contexts.  See Valley Med. Specialists v. Farber, 982 P.2d 1277 (Ariz. 1999) (stating that the physician/patient relationship is "special and entitled to unique protection"); Iredell Digestive Disease Clinic v. Petrozza, 373 S.E.2d 449, 455 (N.C. Ct. App 1988) (stating that with respect to the doctor/patient relationship, the court was "extremely hesitant to deny the patient-consumer any choice whatsoever"); Ohio Urology, Inc., v. Poll, 594 N.E.2d 1027 (Ohio Ct. App. 1991) (stating that the physician/patient relationship is entitled to unique protection, therefore physician's non-compete agreements will be "strictly construed" for reasonableness); see also  Ellis v. McDaniel, 596 P.2d 222 (Nev. 1979); Statesville Med. Group, P.A. v. Dickey, 418 S.E.2d 256 (N.C. Ct. App. 1992).

Also, three states have in recent years enacted statutes totally prohibiting non-compete clauses in physicians contracts. See Colo. Rev. Stat. Ann. § 8-2-113(3) (2003); Del. Code Ann. tit. 6, § 2707 (1993); Mass. Gen. Laws Ann. ch. 112, § 12X (1991).  Additionally, antitrust statutes in several states, although not enacted specifically for this purpose, have been interpreted as prohibiting non-compete clauses between physicians. See Odess v. Taylor, 211 So. 2d 805 (Ala. 1968); Bosley Med. Group v. Abramson, 207 Cal. Rptr. 477 (Cal. Ct. App. 1984); Bergh v. Stephens, 175 So. 2d 787 (Fla. Dist. Ct. App. 1965); Gauthier v. Magee, 141 So. 2d 837 (La. Ct. App. 1962); W. Montana Clinic v. Jacobson, 544 P.2d 807 (Mont. 1976); Spectrum Emergency Care, Inc. v. St. Joseph's

<u>Hosp. & Health Ctr.</u>, 479 N.W.2d 848 (N.D. 1992).[4]

### III. Tennessee Code Annotated Section 63-6-204 (Supp. 1998)

No Tennessee statute currently prohibits covenants not to compete between physicians. However, our legislature has weighed in on the issue to some extent by enacting Tennessee Code Annotated section 63-6-204 (Supp. 1998). This statute specifically allows such non-compete covenants in two limited circumstances and with closely prescribed restrictions. <u>See</u> Tenn. Code Ann. § 63-6-204(d), (e) (Supp. 1998). In adopting this statute in 1997, our legislature recognized two situations in which the public interest weighed in favor of enforcing covenants not to compete against physicians: (1) when the employer is a hospital or an affiliate of a hospital, and (2) when the employer is a "faculty practice plan"[5] associated with a medical school. <u>Id.</u> at (d)(2), (e)(1), (2).

While permitting physician covenants not to compete in the two limited circumstances above, the statute limits the restrictions that may be imposed in either of these situations. For example, if the employer is a hospital and has made a bona fide purchase of the physician's practice, the maximum geographical restriction in a non-compete agreement is (1) the county in which the primary practice site is located or (2) a ten mile radius from this site, whichever is greater. <u>Id.</u> at (d)(2)(A)(I). Also, the maximum duration of the restriction is two years. <u>Id.</u> at (d)(2)(A)(ii). For physicians whose practices have not been purchased by the employer, the employer may only restrict the physician's right to treat or solicit former patients (rather than all patients), and this only for a maximum of one year. <u>Id.</u> at (d)(2)(B), (C).[6] Furthermore, if a physician's employment is terminated by the employer for any reason other than "breach by the employee," then *all* non-compete restrictions are void. <u>Id.</u> at (d)(3).

Non-compete provisions involving a faculty practice plan may completely restrict a former employee/physician's right to practice medicine, but only within the county in which the primary practice site is located or a ten mile radius, whichever is larger, and for a maximum time of two

---

[4] For a more in-depth review of the approaches taken by jurisdictions nationwide regarding the issue of non-compete agreements and physician contracts see Ferdinand S. Tinio, Annotation, <u>Validity and Construction of Contractual Restrictions On Right of Medical Practitioner to Practice, Incident to Employment Agreement</u>, 62 A.L.R. 3d 1014 (2004); Arthur S. Di Dio, <u>The Legal Implications of Noncompetition Agreements in Physician Contracts</u>, 20 J. Legal. Med. 457 (1999); Paula Berg, <u>Judicial Enforcement of Covenants not to Compete Between Physicians: Protecting Doctors' Interests at Patients' Expense</u>, 45 Rutgers L. Rev. 1 (1992).

[5] A "faculty practice plan" is a non-profit professional corporation affiliated with a medical school whose purpose is to allow physician faculty members of the school to conduct a clinical practice in addition to their faculty duties. <u>See</u> <u>Med. Educ. Assistance Corp</u>, 19 S.W.3d at 806. Maintaining an active practice through the faculty practice plan allows physicians to supplement their base salary from the medical school with other income. <u>Id.</u> Faculty practice plans also give students and resident physicians a place to gain valuable hands-on experience. <u>Id.</u>

[6] In fact, if the physician has practiced in the county for five or more years, the employer may restrict the physician's right to <u>solicit</u> or <u>treat</u> former patients for one year. Tenn. Code Ann. 63-6-204(d)(2)(b). If the physician has practiced in the county for less than five years, the employer may only restrict the physician's right to directly <u>solicit</u> former patients for one year. <u>Id.</u> at (d)(2)(C).

years.  Id. at (e)(2)(A), (B).  The statute does, however, allow the contracting parties to agree to further restrictions exceeding these limits if such restrictions are "reasonable and not inimical to the public interest."  Id. at (e)(6).  Importantly, however, the statute does not permit non-compete agreements in either the hospital employer circumstance or the faculty practice plan situation when physicians are practicing ophthalmology, radiology, pathology, anesthesiology or emergency medicine.  Further, non-compete agreements are not permitted in either situation for physicians practicing primary care, obstetrics, or pediatrics in an area which has a shortage of these services.  Id. at (e)(5).

The legislature, in adopting this statute, found that faculty practice plans were entitled to unique protection due to "special facts above and beyond ordinary competition" that would give an unfair competitive advantage to physicians who were former employees of faculty practice plans.  Id. at (e)(1).  The General Assembly stated that the "faculty practice plan's right to be free from unfair competition from a former employed physician outweighs any financial hardship to the former employed physician resulting from the operation of any such restrictive covenant."  Id.

The rationale behind providing special protection to faculty practice plans was discussed in Med. Educ. Assistance Corp. v. State, 19 S.W.3d 803 (Tenn. Ct. App. 1999).[7]  The court identified two competing public interests in evaluating the enforceability of a non-compete covenant involving a faculty practice plan.  Id. at 816.  The first interest was "the right of a patient to choose her physician and to be allowed to continue that relationship even after the physician leaves her place of employment."  Id.  In competition with this was "the public's interest in having an accredited, qualified, and well staffed medical college in East Tennessee."  Id.  Weighing these two interests, the court ultimately held that the covenant was enforceable because of the public benefit derived from having physicians trained by qualified faculty.  Id.

When Tennessee Code Annotated section 63-6-204 was enacted, it was well established that covenants not to compete were disfavored in Tennessee.  See Hasty, 671 S.W.2d at 472.  Additionally, covenants not to compete between attorneys had been prohibited for a number of years.  See Spiegel, 811 S.W.2d at 529-30.  "[T]he Legislature is presumed to know the state of the law at the time it passes legislation."  State v. Mixon, 983 S.W.2d 661, 669 (Tenn. 1999); see Cronin v. Howe, 906 S.W.2d 910, 912 (Tenn. 1995).  Thus, knowing that covenants not to compete were disfavored generally, and that they were prohibited completely in a profession comparable to the practice of medicine, the legislature chose to affirmatively provide for covenants not to compete for physicians, but only in very limited circumstances and with specifically prescribed limits on the scope of those covenants.  We find it significant that the legislature chose not to validate all restrictive covenants applying to physicians, especially given that the legislature presumably knew that this Court had found all such covenants to be void as against public policy in a similar

_____

[7] While Tennessee Code Annotated section 63-6-204 had been enacted prior to the time Med. Educ. Assistance Corp. was decided, it did not apply because the employment agreement at issue had been entered into prior to the enactment of the statute.  19 S.W.3d at 813.  However, the Court of Appeals did comment that the statute was simply a codification of the existing law.  Id.

profession.

In analyzing this issue, we see no practical difference between the practice of law and the practice of medicine. Both professions involve a public interest generally not present in commercial contexts. Both entail a duty on the part of practitioners to make their services available to the public. Also, both are marked by a relationship between the professional and the patient or client that goes well beyond merely providing goods or services. These relationships are "consensual, highly fiduciary and peculiarly dependant on the patient's or client's trust and confidence in the physician consulted or attorney retained." Karlin, 390 A.2d 1161, 1171 (Smith, J., dissenting). In both contexts, restrictive covenants have a destructive impact on those relationships. The rules governing other businesses and trades are not relevant to either the legal or medical profession, as both often require the disclosure of private and confidential information such as, in the context of physician and patient, personal medical or family history. We agree with the dissent of Justice Smith in Shankman v. Coastal Psychiatric Assocs, 368 S.E.2d 753 (Ga. 1988) in which he stated:

> The medical profession, like the legal profession, is one that of necessity must have the faith and confidence of its patients (clients) in order to give effective treatment. When a patient (client) has entrusted confidential information to the doctor (lawyer) this creates a relationship of confidence and the patient (client) does not wish to have that relationship involuntarily terminated.

368 S.E. 2d at 754 (Smith, J., dissenting). The right of a person to choose the physician that he or she believes is best able to provide treatment is so fundamental that we can not allow it to be denied because of an employer's restrictive covenant. Were we to hold otherwise, many of Dr. Udom's patients would be denied the opportunity to choose whether or not they wanted to continue being treated by him. These patients, who have entrusted confidential information to Dr. Udom by virtue of their highly fiduciary relationship with him, should not have that relationship involuntarily terminated.


## CONCLUSION

Due to the important public policy considerations implicated by physicians' covenants not to compete, along with the ethical problems raised by them, and our state legislature's decision not to statutorily validate all such covenants, we conclude that non-compete agreements such as the one at issue in the present case are inimical to public policy and unenforceable. Public policy considerations such as the right to freedom of choice in physicians, the right to continue an on-going relationship with a physician, and the benefits derived from having an increased number of physicians practicing in any given community all outweigh the business interests of an employer. In addition, we are guided by the American Medical Association's ethical standards which view covenants not to compete as against public policy, because according to the AMA, such agreements "restrict competition, disrupt continuity of care, and potentially deprive the public of medical services." Also persuasive is the fact that our legislature has elected to affirmatively provide for such

covenants, but in very limited contexts. For these reasons, we hold that except for restrictions specifically provided for by statute, covenants not to compete are unenforceable against physicians.

Costs of this appeal are taxed to the appellee, Murfreesboro Medical Clinic, P.A., or its sureties, for which execution may issue if necessary.

_____
WILLIAM M. BARKER, JUSTICE