IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 24, 2006 Session

# GIRTMAN & ASSOCIATES, INC. v. STEPHEN ST. AMOUR, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 04-2344-III     Ellen Hobbs Lyle, Chancellor**

---

**No. M2005-00936-COA-R3-CV - Filed on April 27, 2007**

---

A commercial dealer in doors and associated hardware sued a former employee for breach of a non-compete agreement. The dealer asked the court to award it either injunctive relief or liquidated damages in the amount of $321,500. After a bench trial the trial court concluded that the non-compete agreement was unenforceable under the circumstances and dismissed the claim for liquidated damages. The court did, however, award the plaintiff nominal damages of $200 on its claim of unfair competition based on use of a proprietary form, as well as punitive damages of $3,000 on the same claim. The dealer appealed. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Phillip Byron Jones, Nashville, Tennessee, for the appellant, Girtman & Associates, Inc.

Gregory L. Cashion, S. Joseph Welborn, Nashville, Tennessee, for the appellees, Stephen St. Amour, and Isenhour Door Products, Inc.

## OPINION

### I. A COVENANT NOT TO COMPETE

Plaintiff Girtman & Associates ("Girtman") is a family-owned vendor of doors and associated hardware for commercial construction. Its business includes a local sales division in Nashville and a national accounts division that operates all the over the country. An associated business, Girtman Total Openings (GTO), installs many of the doors that Girtman sells.

Girtman does no residential work. Its clients are primarily large institutions and businesses. In Nashville, Girtman has furnished its products to the Country Music Hall of Fame and the

Schermerhorn Symphony Hall among others. Its national clients include Wal-Mart, Marriott Hotels, HCA Hospitals and Circuit City.

Defendant Stephen St. Amour is a high school graduate with two years of college but no degree. During the first seven years of his working life, he held down a variety of jobs. In 1993, he was hired by Girtman as a salesperson. He had no prior experience in the door industry at the time, and his employer had him take some general courses to familiarize him with its products and processes. He apparently performed well in the job, and in 1997 or 1998 he was promoted from salesman to manager of the company's local sales division.

Girtman published an employee manual. All employees, including Mr. St. Amour, were required to execute its signature page. A portion of the manual relevant to one claim in this case reads,

> I am aware that during the course of my employment confidential information will be made available to me, *i.e.*, product designs, marketing strategies, customer lists, pricing policies and other related information. I understand that this information is critical to the success of Girtman Group and must not be given out or used outside of Girtman Group's premises or with non-Girtman Group employees. Upon termination of employment whether voluntary or involuntary, I hereby agree not to utilize or exploit this information with any other individual or company.

On June 1, 1998, Mr. St. Amour's supervisors presented him with the agreement that is the primary basis of this lawsuit and asked him to sign it. The proof shows that all of Girtman's estimators and project managers were required to sign the same basic agreement. The document, entitled "Estimator Agreement," stipulated that Girtman would send the employee to certain specialized training courses and pay all the costs associated with such courses. But, in consideration for that opportunity,

> Estimator expressly agrees that after termination of his or her employment with Nodak,[1] for whatever reason, he or she will not, directly or indirectly, as an employee, officer, owner, partner or otherwise for a period of two (2) years solicit any customer to whom Girtman sold goods or services within the three (3) years preceding the date of this Agreement or any period after the date of this Agreement. After termination of Estimator's employment, for whatever reason, Estimator will not, for a period of two (2) years alone or in association with any individual or any entity carry on, be engaged or employed by or take part in, consult or advise, or own, share in the earnings or invest in the stock, bonds or other securities of any entity in the State of Tennessee or any adjacent state which is engaged in the sale, fabrication or installation of metal doors, frames, hollow metal door products and associated

---

[1] The Estimator Agreement recites that "Nodak" is a Tennessee limited liability company licensed as an employee leasing company, and that pursuant to an agreement between Girtman and Nodak, Mr. St. Amour was an employee leased to Girtman by Nodak.

hardware or related services or any business substantially similar to or which is in competition with the business of Girtman . . . .

Paragraph 8 of the document states that if the Estimator violates the agreement and the courts decline to award Girtman specific performance "with respect to confidentiality and trade secrets and non-competition, Estimator must pay Girtman liquidated damages equal to fifty (50%) percent of the gross revenue from all transactions in breach of these provisions," and further states "that amount is liquidated damages and not a penalty."

After Mr. St. Amour signed the document, he attended a number of week-long courses in four different cities. Girtman paid all the expenses associated with the training, including airfare, hotels, meals, fees and dues. Completion of a series of these courses prepares the student for a professional examination that can result in certification by the Door and Hardware Institute. Such certifications are highly-valued in the industry, with some organizations making the presence of certified individuals on the staff of vendors a bidding requirement. As Matthew Harris, the general manager of Girtman & Associates and a key witness in this case testified, "the certifications lend great credibility to an individual and to an organization." When Mr. St. Amour received certification as an Architectural Hardware Consultant in September of 2001, Girtman awarded him a $5,000 raise, effective immediately.

Mr. St. Amour's training and skills developed to the point where he became capable of shepherding a project from start to finish, including bidding, estimating, project management and detailing. As a result of his efforts, he was elevated to the position of a vice president of Girtman & Associates in 2002. He was earning $36,000 a year at the time he signed the Estimator Agreement. By the time he was terminated from the company, his annual salary had increased to $70,000.

Although his colleagues respected his technical skills, friction apparently developed between Mr. St. Amour and the other members of Girtman's management team. According to Mr. Harris, as Mr. St. Amour became more knowledgeable and skilled, he also became more opinionated and less capable of compromise when other members of the team did not agree with his ideas as to the best way to run the company. According to Mr. St. Amour, he was successfully operating his own division of the company, but other managers whose divisions were less successful tried to reorganize the work in a way that was counter-productive and damaging to the integrity of the company's efforts.

The friction apparently worsened, but Mr. St. Amour testified that he was never given any kind of written reprimand or letter of discipline. On March 19, 2003, Mr. Harris told him that Girtman & Associates no longer desired his services. He was given the choice of either resigning or being terminated. In either event, he was told that if he executed a document affirming the non-compete agreement, Girtman would give him a severance package which included four weeks severance pay and continuation of health insurance. If he chose not to sign, there would be no severance package. Mr. St. Amour chose to be terminated and to sign the agreement, which stated,

"The reasons for Stephen St. Amour's termination include the consolidation of the G&A and GTO sales force, as well as compatibility issues."

A few weeks after losing his position with Girtman, Mr. St. Amour was offered a job with a firm in Texas at higher pay than he had been earning with Girtman. He accepted the job. Although his new company was in the same type of business as Girtman, Mr. St. Amour's new job was not in violation of the non-compete agreement because it was not located in Tennessee or a contiguous state. However, only four months before his termination from Girtman, Mr. St. Amour, his wife and their three children had moved into a new house he had recently built in Murfreesboro. Mr. St. Amour's family had remained in Tennessee while he worked in Houston, creating difficulties for him and his family.[2]

Because of his family situation and dissatisfaction with his employer's business practices, after about three months, Mr. St. Amour left his Texas job and returned to Nashville where he found a sales job with Best Access, a lock manufacturer. Because Girtman does not manufacture locks, Best Access was not in competition with it. However, Best Access was paying Mr. St. Amour far less than he was accustomed to, and his wife became pregnant with their fourth child, leading him to look for new employment.

Mr. St. Amour became aware of a possible position with Isenhour Door Products ("IDP") after two of its key employees left. Since IDP was in the same business as Girtman, he spoke to both Matthew Harris and David Isenhour, IDP's founder and owner, about the non-compete agreement and about ways he might be able to work for IDP without triggering its provisions. On March 2, 2004, he wrote a letter to Matthew Harris, asking if the agreement could be amended so he could seek employment in IDP's Nashville office on a limited basis. He proposed that he only perform the duties of estimating, project management and detailing of projects for sales generated by others outside of the Middle Tennessee market, and that he have no contact with any sales activity or any general contractors in the Nashville area. Mr. Harris did not respond to the letter.

After waiting for a response from Girtman for six weeks, in May of 2004, Mr. St. Amour left Best Access and began working for IDP under the limitations outlined in his letter. Mr. St. Amour's job was structured so he would not solicit customers or give out business cards. He only worked as a project manager on business that had already been acquired for IDP by other estimators, and he avoided contact with any of Girtman's local customers except when required as part of his duties as manager of ongoing projects. However, Girtman was obviously not satisfied with this arrangement.

---

[2]Mr. St. Amour testified that a few months before he bought the Murfreesboro property, he spoke to Matthew Harris, and asked him "if there was anything I needed to know now about the company, about myself, you know, getting ready to have a big expenditure. He said, No, everything's fine, not to worry about it, build your house."

## II. PROCEEDINGS IN THE TRIAL COURT

On August 11, 2004, Girtman & Associates filed suit against Stephen St. Amour and Isenhour Door Products in the Chancery Court of Davidson County. Girtman's claims against Mr. St. Amour were for breach of the Estimator agreement and its non-compete clause and for unfair competition. A companion statutory claim was asserted against IDP for procurement of breach of contract, pursuant to Tenn. Code Ann. § 47-50-109.

Girtman asked the court to enjoin Mr. St. Amour from working any longer for IDP, at least until the expiration of the non-compete clause. Girtman also asked for $321,500 in liquidated damages pursuant to the agreement. This sum was calculated by 50% of the revenue generated by the projects that Mr. St. Amour worked on during his employment at IDP.[3] Girtman also asked the court to order IDP to pay it compensatory damages, including all the costs associated with Mr. St. Amour's training and his severance pay and to treble those damages.

The trial of the matter was conducted over two days. The plaintiff called Charles Girtman, the founder of Girtman & Associates; Matthew Harris, its general manager and corporate secretary; and Neal Frazier, former president of the Door and Hardware Institute. The defendants called Mr. St. Amour and David Isenhour. All the witnesses were cross-examined extensively, and for the most part their accounts were factually consistent with one another.

As the testimony of several of the witnesses demonstrated, the door and associated hardware industry is very detail-oriented and involves highly technical considerations. The installation of proper openings at commercial sites requires not only familiarity with the hardware involved, but also with the requirements of construction and fire safety codes, security considerations, and compliance with the Americans with Disability Act. The provision and installation of the appropriate doors requires close and efficient cooperation between architects, manufacturers, distributors, and contractors.

In order to achieve such efficiency, distributors use certain standardized forms for specifications, estimates, bids, change orders and other purposes. A considerable amount of testimony at trial was focused on forms developed by Girtman which Mr. St. Amour used on a few occasions while working for IDP. Mr. Harris described them as possibly confidential, and at least proprietary.

Mr. St. Amour testified that when his wife was pregnant with their twin girls, Girtman was kind enough to allow him to do some of his work from home. He downloaded some of the company's standard forms from a notebook computer onto his home computer so he could do that work. When he began working for IDP, he faced the need to send out a critical change order quickly, and he used the form on his computer to draft the order. He testified that this was an isolated

---

[3] Girtman later acknowledged that it was asking for the liquidated damages as an alternative to injunctive relief rather than in addition to it.

incident and that he did not make the form available for general use at IDP. On cross-examination, he admitted using at least one other Girtman form while at IDP.

Mr. St. Amour further testified all the training he was given provided him with general skills and knowledge of the trade, but was not specific to Girtman's operations; that since working for IDP he had not contacted any of Girtman's customers in regard to any of their projects in Tennessee; and that he had not disclosed or utilized any confidential information acquired during his employment at Girtman. The proof showed that Mr. St. Amour's work for IDP almost exclusively involved projects that were already underway, but were behind schedule or in trouble. Mr. St. Amour's expertise in project management enabled IDP to successfully complete work that it already had under contract.

David Isenhour confirmed Mr. St. Amour's testimony and stated that because of the non-compete agreement and on advice of counsel, he had assigned him to project management only and had kept him from handling any duties associated with sales or solicitation. He also testified that IDP has its own forms for all the major functions of the company and that none of those forms have been changed during the time that Stephen St. Amour worked there.

At the close of all the proof, the court took the case under advisement. On March 15, 2005, the court filed a thorough Memorandum Opinion and Order, which included extensive findings of fact. The court carefully examined the circumstances in view of the employer's right to protect itself from unfair competition by a former employee through a covenant that is reasonable in geographic scope and duration. Additionally, the court recognized the employee's right to use the skills he has acquired to earn a living for himself and his family. After thoughtful consideration, the court dismissed all Girtman's causes of action with the exception of its claim of unfair competition against Mr. St. Amour for his unauthorized use of the forms prepared by Girtman. For that violation, the court awarded Girtman nominal damages of $200 and punitive damages of $3,000.[4]

Girtman has appealed the trial court's denial of relief on its claim of breach of the non-competition agreement.

### III. ENFORCEABILITY OF A COVENANT NOT TO COMPETE

The courts of this state have had numerous opportunities to consider the validity of non-compete agreements. *See Dabora v. Kline*, 884 S.W.2d 475, 477 (Tenn. Ct. App. 1994). They

---

[4]The trial court found that Mr. St. Amour's use of forms created by Girtman while he was working for IDP supported Girtman's separate claim for unfair competition. The court noted that Mr. St. Amour had signed an agreement that stated "[u]pon termination of employment, whether voluntary or involuntary I hereby agree not to utilize or exploit this information with any other individual or company." Despite this agreement, Mr. St. Amour retained Girtman's work forms on his personal computer for over a year after leaving employment there, and used those forms on at least two occasions when he was pressed for time at IDP. The court observed that quantifying any injury to Girtman from Mr. St. Amour's actions was difficult, and awarded it nominal damages of $200. The court also awarded Girtman $3,000 in punitive damages "[t]o deter similar future behavior." Neither party has appealed the court's handling of this issue.

-6-

have frequently observed that such covenants are not favored by law, because they are deemed to be in restraint of trade. *Hasty v. Rent-A-Driver*, 671 S.W.2d 471, 472 (Tenn. 1984); *AllRight Auto Parks Inc. v. Berry*, 409 S.W.2d 361, 363 (Tenn. 1966). They may also place an inequitable burden upon a worker's ability to earn a living, so such covenants are construed strictly in favor of the employee. *Vantage Technology, LLC v. Cross*, 17 S.W.3d 637, 644 (Tenn. Ct. App. 1999). Recently, the Tennessee Supreme Court summarized the law on covenants not to compete:

> In general, covenants not to compete are disfavored in Tennessee. *See Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d 471, 472 (Tenn. 1984). These covenants are viewed as a restraint of trade, and as such, are construed strictly in favor of the employee. *Id*. However, if there is a legitimate business interest to be protected and the time and territorial limitations are reasonable then non-compete agreements are enforceable. *Id*. at 473. Factors relevant to whether a covenant is reasonable include: (1) the consideration supporting the covenant; (2) the threatened danger to the employer in the absence of the covenant; (3) the economic hardship imposed on the employee by the covenant; and (4) whether the covenant is inimical to the public interest. *Id*. at 472-73 (citing *Allright Auto Parks, Inc. v. Berry*, 219 Tenn. 280, 409 S.W.2d 361, 363 (1966)). Also, the time and territorial limits must be no greater than necessary to protect the business interest of the employer. *Allright Auto Parks*, 409 S.W.2d at 363.

*Murfreesboro Medical Clinic, P.A. v. Udom*, 166 S.W.3d 674, 678 (Tenn. 2005).

Covenants not to compete are not invalid *per se*, but may be enforced if they are found to be reasonable under the circumstances. *Hasty v. Rent-A-Driver*, 671 S.W.2d at 472. *See also AllRight Auto Parks,* 409 S.W.2d at 365; *Matthews v. Barnes*, 293 S.W. 993 (Tenn. 1927); *Ramsey v. Mutual Supply*, 427 S.W.2d 849 (Tenn. Ct. App. 1968). Our courts have held that such covenants are enforceable if an employee would otherwise be able to exercise an unfair advantage in future competition with his employer and if they are no broader in duration or as to the territory they embrace "than is reasonably necessary to secure the protection of the business or good will of the employer." *Matthews v. Barnes,* 293 S.W. at 994. Aside from these general principles, no simple rule has been formulated to enable the courts to easily determine whether or not a covenant is reasonable. Each case is fact-driven, and must be decided on an *ad hoc* basis. *Allright Auto Parks,* 409 S.W.2d at 364.

## IV. PROTECTABLE BUSINESS INTEREST

The basic requirement for enforceability of a covenant not to compete is the existence of a legitimate business interest which is properly protectable and is actually protected by the agreement. *Murfreesboro Medical Clinic*, 166 S.W.3d at 678; *Vantage Technology, LLC v. Cross*, 17 S.W.3d at 644. There is no legitimate interest in protection from competition, only from unfair competition.

It would be contrary to our commitment to the freedom of the marketplace to allow an employer to use a restrictive covenant to prevent ordinary competition from former employees. To enforce a covenant not to compete, the employer must be able to show the presence of special facts above and beyond ordinary competition that would give the employee an unfair advantage when competing with his former employer.

*Selox, Inc. v. Ford*, 675 S.W.2d 474, 476 (Tenn. 1984).

As the trial court herein explained, special facts above and beyond ordinary competition might include specialized training received from the employer, access to confidential information such as business secrets, confidential pricing information and confidential customer lists, and situations where the employer's customers tend to associate the business with the employee because of repeated contacts with him. *Vantage Technology, LLC v. Cross*, 17 S.W.3d at 644.

In this case, although Mr. St. Amour had become conversant with the detailed requirements of the door and hardware industry through his employment and training, the trial court found there was no colorable proof that he had access to customer lists that could not be ascertained through public sources or to trade secrets that were unique to Girtman. The court also found there was no proof that Girtman's customers associated its business with Mr. St. Amour to the extent that they identified him with it. The evidence supports these findings.

The trial court also noted that the evidence showed that the door and hardware industry is cost-driven and that the most significant information that an employee might learn which would make his competition unfair would be the pricing schedule and the discounts available to customers. The court further observed that the price of steel is a very important factor in product pricing, and that such prices had recently been volatile and had increased repeatedly, with at least two changes in the year that Mr. St. Amour was not working for a competitor of Girtman. The court reasoned that ". . . any knowledge or information Mr. St. Amour had about Girtman's pricing was irrelevant by the time he commenced his employment with Isenhour."[5]

Girtman's primary argument is that the training it afforded Mr. St. Amour gives him a competitive edge that it would be unfair to use against it. The applicable rule is that "general knowledge and skill appertain exclusively to the employee, even if acquired with expensive training, and thus does not constitute a protectable interest of the employer." *Hasty v. Rent-A-Driver, Inc.*, 671 S.W.2d at 473. As the court similarly observed in *Selox Inc. v. Ford*, "[a] line must be drawn between the general skills and knowledge of the trade and information that is peculiar to the employer's business." 675 S.W.2d at 476, *quoting* RESTATEMENT (SECOND) OF CONTRACTS § 188, comment (g)). *See also, Corbin v. Tom Lange Company, Inc.*, No. M2002-01162-COA-R3-CV,

---

[5] Based on these factual findings, the trial court also held that the proof of changes in the price of steel on a basis more frequently than every two years "undercuts the reasonableness of the two-year non-compete period."

2003 WL 22843167 (Tenn. Ct. App. Dec. 1, 2003) (Tenn. R. App. P. 11 perm. app. denied Oct. 4, 2004) (quoting *Hasty* and holding that knowledge and skill acquired through expensive training is not a protectable interest if the knowledge and skill are not peculiar to the employer).

The trial court herein found that the training sessions that Mr. St. Amour attended were not taught by Girtman; Girtman did not provide any materials for them; the seminars did not provide training about specialized techniques or practices of Girtman; the programs were not solely for Girtman employees, but instead were open to any participants who wished to apply, pay and attend. Accordingly, the trial court concluded that Girtman failed to prove that Mr. St. Amour had received specialized or unique training that would give him an unfair advantage in future competition with Girtman.

The court's findings of fact are supported by the evidence. The knowledge acquired by Mr. St. Amour through the training Girtman paid for is not a "legitimate business interest" protectable by a non-compete agreement. The training Mr. St. Amour received in this case was paid for by his employer, but enrollment in those courses was not limited to Girtman employees. Professionals from other competing businesses in the door and hardware industry attended and received the same instruction Mr. St. Amour received. The courses imparted general knowledge of the door and hardware industry, but none of it was specific to Girtman's way of conducting business. Thus, the training did not give Mr. St. Amour an unfair advantage in competition and did not endow Girtman with a protectable business interest. *Vantage Technology,* 17 S.W.3d at 644.

We agree with the trial court that the non-compete provision was unenforceable because Girtman failed to prove it had a protectable business interest that would justify preventing Mr. Girtman from using the knowledge and skill he gained through the generalized training he received.[6] Consequently, neither the injunctive relief nor the damages sought by Girtman is available or warranted.

## V. REASONABLENESS OF LIMITATIONS

Although the trial court found the non-compete provision unenforceable because there was no legitimate business interest being protected, the court went on to examine the factors relevant to a reasonableness determination. The court found the covenant unenforceable because its limitation as to duration was not reasonable. This conclusion is supported by the evidence regarding pricing fluctuations in the industry, as described earlier.

The other factors relevant to a determination of whether the non-compete provision is reasonable include (1) the consideration supporting the covenant; (2) the threatened danger to the

---

[6]Girtman's agreement also included a provision that required an employee who was sent to the training sessions at issue to reimburse Girtman for training costs and expenses if the employee voluntarily quits employment or is terminated for cause. Thus, the agreement protects Girtman's investment. There is no indication Girtman sought to collect from Mr. St. Amour, probably because of the circumstances surrounding his termination.

employer in the absence of the covenant; (3) the economic hardship imposed on the employee by the covenant; and (4) whether the covenant is inimical to the public interest. *Murfreesboro Medical Clinic, P.A. v. Udom*, 166 S.W.3d at 678.

There is no dispute that the agreement in this case is supported by adequate consideration. Continued future employment of an at-will employee has been deemed to be sufficient consideration in and of itself to support enforcement of a covenant not to compete. *Central Adjustment Covenant v. Ingram,* 678 S.W.2d 28, 33 (Tenn. 1984); *Selox, Inc. v. Ford*, 675 S.W.2d at 475; *Ramsey v. Mutual Supply*, 427 S.W.2d 849, 852 (Tenn. Ct. App. 1968). In addition to noting that Mr. St. Amour enjoyed five years of fruitful employment after signing the non-compete agreement, Girtman argues that it furnished additional consideration to him in the form of advanced training and the valuable certifications he received as a result. However, Girtman benefitted from this training while Mr. St. Amour continued to work there.

Girtman also argues that a decision by the court not to enforce its covenant would damage the public interest in higher professional standards by removing incentives for companies to pay for its employees to receive advanced training. We find this to be a dubious argument. Training employees is in the best interest of the employer; Girtman itself benefitted from the training it provided.

Mr. St. Amour's earning ability was admittedly enhanced by the improvement in his professional credentials, but the proof showed that Girtman also received substantial benefits from its investment in him, in the form of increased business and heightened credibility with architectural firms. Girtman thus had every incentive to train its employees. It also could have continued to reap the rewards from its investment in Mr. St. Amour's training had it not decided to terminate his employment. Girtman protected its interests by requiring employees to reimburse it for the training costs and expenses it incurred if the employee was terminated for cause or voluntarily ceased employment with Girtman.

The remaining considerations are the danger to Girtman if the non-compete is not enforced balanced against the financial hardship faced by Mr. St. Amour if it is. In striking that balance, we must be mindful that Girtman is not entitled to be shielded from ordinary competition.

While Mr. St. Amour gained technical knowledge in the training courses Girtman sent him to, he also developed skills and experience through working. The fact that he became very good at what he did does not create a protectable interest in Girtman to prevent him from using that skill and experience to make a living. Mr. St. Amour and IDP designed a role for him that would limit the possibility of unfair competition. Based on the facts, we see little danger to Girtman from Mr. St. Amour's employment at IDP. IDP may benefit from Mr. St. Amour's skills, knowledge, and experience, and his presence may make it a stronger competitor. However, Girtman has no right to be protected from strong competition, only from unfair competition. Girtman conceded that there was no evidence it had lost any clients as a result of Mr. St. Amour's employment at IDP.

On the other side of the equation, Mr. St. Amour, after being terminated from Girtman, took precautions to avoid violating the non-compete provision. He even went to Texas, leaving his family behind in Tennessee. He and IDP developed a job for him that would restrict his contact with clients. He is attempting to use the knowledge, skills, and experience he has gained over the years to earn a living. The trial court saw the equities of the case this way:

> Defendant St. Amour was discharged by Girtman. Additionally defendant St. Amour honored the agreement for one year despite having no experience in any other industry and no college degree to parlay into another industry. Finally, in his present employment the defendant does not work in sales or solicit customers.

In sum, Mr. St. Amour used the general knowledge of the door and hardware business he had obtained through his work experience and training to earn an adequate living for himself and his family. He did not rely on any sort of confidential information, and he sought at all times to minimize the competitive impact on his former employer. His work at IDP largely involved helping to complete existing projects that were flagging because of delays and foul-ups in implementation. Girtman could point to no damages resulting from Mr. St. Amour's activities at IDP, and in fact its sales increased after Mr. St. Amour left the company. It thus appears to us that the trial court rightly determined that the balance of hardships weighed heavily in Mr. St. Amour's favor. Thus, even if Girtman had a legitimate business interest in enforcing the non-compete provision, under the facts of this situation, the trial court correctly refused to enforce it.

## VI.

We affirm the order of the trial court. Remand this case to the Chancery Court of Davidson County for any further proceedings necessary. The costs on appeal are taxed to the appellant, Girtman & Associates.

 

_____
PATRICIA J. COTTRELL, JUDGE