# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
August 8, 2013 Session

## JAMES F. DILL, JR. ET AL. v. CONTINENTAL CAR CLUB, INC. ET AL.

**Appeal from the Chancery Court for Rhea County**
**No. 11-CV-10652      Jeffrey F. Stewart, Chancellor**

_____

**No. E2013-00170-COA-R3-CV-FILED-OCTOBER 31, 2013**

_____

Two executive employees of Continental Car Club, Inc., resigned in order to start a business in competition with their former employer. The issues on appeal are (1) whether the employees resigned for "Good Reason" as that term is defined in their employment agreements; (2) whether the employees violated their employment agreements by copying all the data on their work computers to personal computers shortly before resigning; (3) whether the non-competition and non-solicitation provisions of their agreements are enforceable; (4) whether the trial court correctly found the employees liable for conversion; and (5) whether the employees violated the Tennessee or Florida Uniform Trade Secrets Act. We hold that the employees did not establish that they resigned for "Good Reason." We further hold that they violated their employment agreements, and, accordingly, we reverse the trial court's judgment awarding them severance pay and benefits. We affirm the trial court's judgment on the conversion claim but modify the judgment to award the former employer the value of tickets to a football game that one of the employees converted by sending the tickets to business clients, then renting a bus and taking the clients to the game several months after the employee's resignation. We hold that the trial court correctly determined that the covenants not to compete were valid and enforceable and that the agreements are reasonable in time and geographic limits but overbroad in scope. Therefore, we reverse the trial court's judgment in part and modify it in part. With respect to the portion of the trial court's judgment not reversed, we affirm, as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part and Modified in Part; With Respect to the Portion of the Trial Court's Judgment Not Reversed, the Judgment, as Modified, is Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., P.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Edward H. Trent and Catherine E. Shuck, Knoxville, Tennessee, for the appellants, Continental Car Club, Inc. and Fortegra Financial Corporation.

R. Wayne Peters and Gary L. Henry, Chattanooga, Tennessee, for the appellees, James F. Dill, Jr. and James C. Thurman, Jr.

**OPINION**

I.

In 2009, the plaintiffs, James F. Dill, Jr. ("Dill"), and James C. Thurman, Jr., were employed by Continental Car Club, Inc., a corporation based in Dayton, Tennessee, and owned by James F. Dill, Sr. Continental is a motor club similar to AAA that provides roadside assistance to individuals who sign up for membership. In October 2009, Dale Bullard, the chief marketing officer of defendant Fortegra Financial Corporation, approached James F. Dill, Sr. about the possibility of Fortegra purchasing Continental. They negotiated the terms of the sale over the next several months, and the deal closed on May 15, 2010. At that time, Dill had been essentially in charge of running the company with limited assistance from his parents. Thurman had been employed by Continental since 1997 and was also working in an executive capacity. The price of the Continental purchase was $11.9 million.

All of the parties agreed that an integral part of the sale was the agreement of Dill and Thurman to stay with Continental and continue to run the company as employees of Fortegra. The men negotiated employment agreements with Fortegra that were essentially identical, with the exceptions that Dill was named as Continental's Senior Vice President and Thurman was named its Vice President, and Dill's base annual salary was $192,000 and Thurman's was $150,000. The employment agreements provide[1] as follows in pertinent part:

> Section 1. <u>Employment and Position</u>. Subject to Section 2, the Company hereby employs the Executive as Senior Vice President of Continental Car Club, Inc., and the Executive hereby accepts such employment under and subject to the terms and conditions hereinafter set forth.
>
> *       *       *
>
> Section 3. <u>Duties</u>. The Executive shall perform services in a managerial capacity in a manner consistent with the Executive's

---

[1]As noted, Thurman's contract designated him as "Vice President."

position as Vice President of Continental Car Club, Inc., subject to the general supervision of Joe McCaw, President of the Payment Protection Division of the Company.

* * *

Section 6.06. <u>By the Executive for Good Reason</u>. The Executive may terminate this Agreement effective upon written notice to the Company for Good Reason. Such notice must provide a detailed description of the Good Reason. . . . For this purpose, the term "*Good Reason*" shall mean: (i) the assignment to the Executive of any duties inconsistent in any substantial respect with the Executive's position, authority or responsibilities as contemplated by Section 1 of this Agreement or any duties which are illegal or unethical; or (ii) any material failure to pay the compensation or benefits described in Sections 4 or 5 of this Agreement. Notwithstanding the foregoing, in the event the Executive provides notice of Good Reason contained in subclause (i) of the immediately preceding sentence, the Company shall have the opportunity to cure such Good Reason within 30 days of receiving such notice.

* * *

In the event that this Agreement is terminated . . . by the Executive for Good Reason, the Executive shall be entitled to receive, as his exclusive right and remedy in respect of such termination, (i) his Accrued Benefits, (ii) as long as the Executive does not violate the provisions of Section 8 and Section 9 hereof, severance pay equal to the Executive's then current monthly Base Salary . . . for twenty-four (24) months from the date of termination of employment[.]

(Italics and underlining in original.)

The agreements also contain a covenant not to compete by which Dill and Thurman agreed that they "will not (anywhere in the United States where the Company or any of its subsidiaries then conducts business) engage or participate in, . . . or assist in the management of, or provide advisory or other services to . . . any business which is Competitive with the Company" for 2 years after termination of employment. The agreements provided that they

-3-

would "be construed under and enforced in accordance with the internal laws of the State of Florida."

Dill and Thurman testified that they were generally not happy working for Continental after the company was acquired by Fortegra. They felt that they were not getting sufficiently-detailed financial information to effectively run the company, and to monitor whether they were on track to meet their earnings goals, referred to as "EBIDTA," an acronym for "earnings before interest, depreciation, taxes, and amortization." The EBIDTA goals were important to Dill and Thurman because their employment agreements provided for a yearly bonus of up to 30% of their base pay if both Fortegra and Continental met their earnings targets. Approximately four months after Fortegra acquired Continental, it purchased United Motor Club, formerly Continental's biggest business rival and, according to all the testimony, a bitter enemy. Dill and Thurman were dissatisfied with the corporate structure after the acquisition of United – they believed that they had been promised by Fortegra executives, before the Continental purchase, that if Fortegra bought other car clubs, they would be placed under Dill and Thurman's management at Continental. After Fortegra bought United and, later, a third car club called Auto Knight, the three car club companies were each generally run as separate and equal branches of Fortegra's motor club division, and were directed not to compete with one another for already-existing customers. Thirteen months after Dill and Thurman began working for Fortegra, Joe McCaw was replaced as their supervisor by John Short, who was formerly Fortegra's general counsel. Dill and Thurman were unhappy with the change in their supervision.

On July 27, 2011, Dill and Thurman each sent an identical letter of resignation to Fortegra management, which stated in pertinent part as follows:

> Please be advised that I am compelled to terminate my employment with Good Reason. Below is an enumeration of several of the reasons.
>
> 1. The inability of Fortegra to produce and deliver accurate and timely financial statements constitutes a breach in [sic] contract in that I have not been given the tools to properly manage Continental Car Club (CCC). Thus I was potentially rendered unable to reach prescribed goals for performance and bonus. Basic financials have been requested since July of 2010. When they have been sporadically provided, they have been inaccurate and misleading. As those inaccuracies were pointed out, no explanation of any adjustments or corrections was provided.

-4-

2. No review regarding 2010 CCC performance has been done.

3. No goals for 2011 have been discussed or set for expected performance or bonus potential.

4. With the dictate of the CEO that no employees may be hired without his approval, my position and authority as an executive charged with the management of CCC has been diminished without proper notification.

Both Dill and Thurman testified that they intended to start a competing car club immediately after resigning. A day or so before resigning, they hired a company called VOLState, Inc. to copy all of the data on their work computers owned by Fortegra to recently-purchased personal laptops. John Short testified that upon receiving the resignation letters, he immediately called Dill and Thurman to try to alleviate their concerns and address their complaints, in an attempt to dissuade them from leaving Fortegra. After a meeting where it became clear that Dill and Thurman could not be persuaded to stay, Fortegra sent letters on August 3, 2011, reminding them of the contractual provisions restricting competition or solicitation of Fortegra's customers for 24 months. The letters stated that "none of the items enumerated in your resignation letter constitute Good Reason as defined in the Employment Agreement."

On August 18, 2011, Dill and Thurman filed a complaint against Continental and Fortegra, alleging fraudulent inducement, misrepresentation, breach of contract, and breach of the implied duty of good faith and fair dealing. They requested injunctive relief and asked the trial court to declare that they were entitled to full severance pay under their employment contracts, and that the non-compete provisions were void and unenforceable. Fortegra answered and filed a counterclaim alleging breach of the employment agreements, conversion, and violation of the Tennessee and/or Florida Uniform Trade Secrets Act. Following a hearing, the trial court denied the plaintiffs' request for temporary injunctive relief and ruled that Florida law was applicable under the agreements. After a bench trial, the trial court entered an order incorporating its final judgment that contained the following findings of fact and conclusions of law:

> Under Florida law, any breaches of the Executive Employment and Non-Competition Agreements . . . by Defendants are not sufficient to excuse Plaintiffs' continued performance under the Agreements. Therefore, Plaintiffs must comply with their Agreements – including the non-competition and non-solicitation provisions in Section 9 of their Agreements – for a

period of twenty-four months from Plaintiffs' termination of employment on July 27, 2011.

. . . [T]he Court finds that Plaintiffs terminated their employment with Defendants for "Good Reason" under the Agreements and have not violated Sections 8 or 9 of the Agreements. Because Plaintiffs terminated their employment for "Good Reason," Plaintiffs are entitled to compensation and any other damages outlined in Section 7.02 of the Agreements.

* * *

Regarding Defendants' counterclaim, the Court finds in favor of Defendants and against Plaintiffs on Defendants' claim of [c]onversion. Plaintiffs are ordered to return any information belonging to Defendants that Plaintiffs removed from Defendants' computers. The Court expressly finds that Plaintiffs took that information for the purposes of litigation only and Defendants did not suffer any damages as a result of Plaintiffs taking any such information. Therefore, no further damages are awarded to Defendants on their counterclaim.

Fortegra timely filed a notice of appeal.

II.

On appeal, Fortegra raises the following issues, as quoted from its appellate brief:

1. Did the trial court err in determining that Dill and Thurman resigned their employment with Fortegra Financial Corporation for "Good Reason" as that term is defined in Section 6.06 of their Executive Employment and Non-Competition Agreements?

2. Did the trial court err in determining that Dill and Thurman did not violate Articles 8 and 9 of the Executive Employment and Non-Competition Agreements when they surreptitiously copied all documents and data on their work computers immediately prior to their resignations for the purpose of starting a competing car club and retained the Company

-6-

information even after Fortegra requested that all material belonging to the Company be returned?

3. Did the trial court err in determining that Dill and Thurman did not violate the Florida and/or Tennessee Uniform Trade Secrets Act?

Additionally, Dill and Thurman raise the following issues:

4. Did the trial court err in enforcing the non-competition and non-solicitation provisions of the employment agreements?

5. Did the trial court err in finding in favor of the defendants on their conversion claim?

III.

In this non-jury case, our review is de novo upon the record, with a presumption of correctness as to the trial court's factual determinations, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Murfreesboro Med. Clinic, P.A. v. Udom*, 166 S.W.3d 674, 678 (Tenn. 2005). The trial court's conclusions of law, however, are accorded no such presumption. *Udom*, 166 S.W.3d at 678; *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996). Our de novo review is subject to the well-established principle that the trial court is in the best position to assess the credibility of the witnesses; accordingly, such determinations are entitled to great weight on appeal. *Columbus Med. Servs., LLC v. Thomas*, 308 S.W.3d 368, 383 (Tenn. Ct. App. 2009); *Vantage Tech., LLC v. Cross*, 17 S.W.3d 637, 644 (Tenn. Ct. App. 1999).

The first two issues – whether Dill and Thurman resigned for "Good Reason" as defined in the agreements, and whether they violated Sections 8 or 9 of the agreements – require the interpretation of their employment contracts. Under Florida law,

> [t]he trial court's interpretation of a contract is a question of law subject to de novo review. *Whitley v. Royal Trails Prop. Owners' Ass'n, Inc.*, 910 So. 2d 381, 383 (Fla. 5th DCA 2005). The parties' intent, which must be gleaned from the four corners of the document, governs contract interpretation and construction. *Crawford v. Barker*, 64 So. 3d 1246, 1255 (Fla. 2011); *Whitley*, 910 So. 2d at 383. A clear, complete and unambiguous contract does not require judicial construction.

*Jenkins v. Eckerd Corp.*, 913 So. 2d 43, 50 (Fla. 1st DCA 2005). In interpreting a contract, "[c]ourts are not to isolate a single term or group of words and read that part in isolation; the goal is to arrive at a reasonable interpretation of the text of the entire agreement to accomplish its stated meaning and purpose." *Delissio v. Delissio*, 821 So. 2d 350, 353 (Fla. 1st DCA 2002); *see also* **Am. Home Assurance Co. v. Larkin Gen. Hosp., Ltd.**, 593 So. 2d 195, 197 (Fla. 1992) (stating determination of intent requires consideration of contract's language, subject matter, and object and purpose).

*Horizons A Far, LLC v. Plaza N 15, LLC*, 114 So. 3d 992, 994 (Fla. Dist. Ct. App. 2012). Furthermore, "[t]he contract should be reviewed as a whole and all language given effect, and where the language is clear and unambiguous, the contract should be enforced as it reads." *PNC Bank, N.A. v. Progressive Emp'r Servs. II*, 55 So. 3d 655, 658 (Fla. Dist. Ct. App. 2011) (quoting *Leisure Resorts, Inc. v. City of West Palm Beach*, 864 So. 2d 1163, 1166 (Fla. Dist. Ct. App. 2003)).

IV.

A.

The first issue we address is whether the trial court correctly concluded that Dill and Thurman established that they resigned for "Good Reason" – *as that term is specifically defined* in the employment agreements as follows:

> For this purpose, the term "*Good Reason*" shall mean: (i) the assignment to the Executive of any duties inconsistent in any substantial respect with the Executive's position, authority or responsibilities as contemplated by Section 1 of this Agreement[.][2]

Resolution of this issue will determine whether Dill and Thurman are entitled to a significant benefit – severance pay in the amount of their regular base salaries for two years, plus additional substantial benefits such as continuing health, dental and life insurance coverage,

---

[2]The agreements further define "Good Reason" as "the assignment to the Executive of any duties . . .which are illegal or unethical; or (ii) any material failure to pay the compensation or benefits described in Sections 4 or 5 of this Agreement." Neither Dill nor Thurman has alleged that Fortegra asked them to do anything illegal or unethical, or that it failed to pay them as required by the contract.

as agreed to by the parties in Section 7.02 of the agreements. We conclude that Dill and Thurman did not establish that they resigned for "Good Reason" for the following reasons: (1) several of the complaints made by Dill and Thurman about their work environment, and later relied upon as reasons for quitting, were not enumerated or raised in their resignation letters, as required by the agreements; (2) none of Dill and Thurman's complaints, including those that they failed to raise with Fortegra, establish that Fortegra assigned to either Dill or Thurman "any duties inconsistent in any substantial respect with [his] position, authority or responsibilities"; and (3) the testimony, including that of Dill, establishes that Fortegra had effectively cured perhaps the most serious complaint, the lack of sufficiently detailed financial information, well before Dill and Thurman resigned.

The employment agreements evince the clear intent of the parties that Fortegra must be given specific notice of the employees' alleged "Good Reason" complaints supporting their decision to resign, and an opportunity to cure them. In this regard, the agreements state:

> The Executive may terminate this Agreement effective upon written notice to the Company for Good Reason. *Such notice must provide a detailed description of the Good Reason*. . . . Notwithstanding the foregoing, in the event the Executive provides notice of Good Reason . . ., *the Company shall have the opportunity to cure* such Good Reason within 30 days of receiving such notice.

(Emphasis added.) The resignation letters complain of the following: inability of Fortegra to produce and deliver accurate and timely financial statements; no review of Continental's 2010 performance; no earnings goals set for 2011; and Fortegra CEO Rick Kahlbaugh's decision to require approval for all new company hires. However, much of Dill and Thurman's proof and argument at trial and on appeal focus on a different set of complaints: (1) Fortegra's subsequent acquisition of Continental's chief rival, United, and Dill and Thurman's allegation that Fortegra broke a promise that any other car clubs bought later by Fortegra would be put under their leadership at Continental; (2) the shift of accounting methods from a cash basis (used by Continental before the sale) to an accrual basis, which was required by the Securities and Exchange Commission and comported with Generally Accepted Accounting Principles; and (3) the replacement of Joe McCaw with John Short as the immediate supervisor of Dill and Thurman. The trial court held as follows with regard to these complaints:

> Some of these are matters that are the realities of moving into a large corporate structure and could have been anticipated. There are no specific promises or guarantees in the contract itself

-9-

regarding the future realignment or dealing with Mr. Short's [*sic*: McCaw's] retirement or the fact that he might leave the company for some other reason, and neither did the contract specify no other car club would[] be bought or, if so, it would be put under their direction. These are matters that could have been put into the contract at the time of negotiation.

We agree with these observations. We also agree with the trial court's ruling that Dill and Thurman established no breach of the employment agreements by Fortegra. Moreover, regarding the complaints that Dill and Thurman failed to raise with Fortegra before filing this lawsuit, because the agreements required them to provide written notice with a detailed description of their "Good Reasons," they should not be heard to argue after the fact that these complaints provided them with "Good Reason" to resign.

When John Short received the resignation letters, he immediately called Dill and Thurman to set up a face-to-face meeting to address their complaints. Short testified that he was surprised by the resignations. When Short met with Dill and Thurman, they discussed the grievances enumerated in the letters point-by-point. Short testified that he looked at the resignation letters and "said, well, we can address all these things immediately and just ticked them off . . . It's like we can address and fix, cure, if you will, all these things and give it to them." All of Fortegra's executives testified to the effect that they wanted to work with Dill and Thurman and keep them as employees. Dill testified as follows about the meeting with Short:

> Two days after Jim Thurman and I quit, we had been speaking back and forth to John [Short] and he stated repeatedly that he was sorry about the situation, that he wanted to try to keep us. . . .[He said] I want to do what we can to keep you guys. We spoke over and over.

Dill had complained in early 2011 about his dissatisfaction with the financial information that he was receiving from the company. Short responded by directing Teresa Peel, the vice president of financial operations for Fortegra's motor club division, and Krista Gayle, a CPA working for Fortegra, to provide Dill more detailed financial information. On March 15, 2011, Short sent an email to Dill informing him that "Teresa Peel and Krista Gayle will be providing financial analysis and reporting support for our group. I encourage them to work directly with each of you and your teams, and you too should look at them as a resource that you should call upon directly." Peel testified that she began sending detailed monthly financial reports as Dill had requested. She never received a request from Dill asking for more information or questioning the accuracy of the reports. Dill testified that

Peel sent him the detailed financial information he requested in February 2011, stating as follows:

> Q: And tab 54 should be all company reports for the months of February, March, April, May, and June?
>
> A: I – I see one for February. Okay. This appears to be March, April, May.
>
> Q: You got these every month, right?
>
> A: Yes.
>
> Q: And these reports, again, identified by customer and client their sales for the month, sales for the year, cancellations by the month and year, and all commissions paid by month and year?
>
> A: Yes.
>
>          *        *        *
>
> Q: Look under tab 57. It's a quarterly report for all of the car clubs, is it not?
>
> A: It says consolidated car clubs, yes.
>
> Q: All right. You received this from Teresa Peel?
>
> A: I received it from somebody with regard to the planning meeting that was going to take place in May.
>
> Q: All right. In that document it contains a breakout of Continental Car Club's performance; correct?
>
> A: Yes.
>
>          *        *        *
>
> Q: . . .So you've got the breakout, then, for your totals that include membership fees, which are your sales?

A: Okay. . . .

Q: Okay. It identifies commissions, correct?

A: I'm not seeing a line item that just says commissions.

Q: Second and third line under activity name, one is auto club service fee income, which are the commissions paid on the sales.

A: Okay.

Q: And change in deferred commissions?

A: Yes.

Q: Right? And then you've got claims and cancellations?

A: Yes, under activity name.  Yes.

Q: Correct?

A: Yes.

Q: The breakout of the fee income that you requested in [your] February 18th letter?

A: Yes.

                    *       *       *

Q: So as of May 20th, now you're getting the information requested in your February 18th letter?

A: For the most part, yes.

The evidence, including the testimony cited above, preponderates in favor of a conclusion that Fortegra was providing Dill and Thurman the detailed financial information needed to run Continental, as Dill requested, months before their resignations on July 27, 2011.

-12-

Regarding the resignation letters' complaint that CEO Kahlbaugh had required approval of all new hires, both Dill and Thurman testified that they never made a request to hire anyone after that policy change took place, and that Kahlbaugh did not ever deny a request to hire anyone. Thurman, when asked whether "that directive didn't affect your job one way or another," stated, "no, it hadn't as of that time."

With regard to whether Fortegra assigned to Dill any duties inconsistent in any substantial respect with his position, authority or responsibilities, Dill testified as follows:

> Q: After the purchase of Continental by Fortegra, you continued to oversee all operations at Continental?
>
> A: For the most part.
>
> *    *    *
>
> Q: What were your responsibilities once you became employed with Fortegra?
>
> A: To oversee the general operation of Continental Car Club and to continue my relationship with my customers.
>
> Q: You continued to do that throughout your employment with Continental?
>
> A: Yes, I did.
>
> Q: Your duties and responsibilities never changed, did they?
>
> A: Somewhat, yes, they – they changed.
>
> Q: How did they change?
>
> A: Who I report to changed, how I report. There were different accounting departments I guess – bookkeeping departments, that changed. Every week there was somebody else that needed some type of documentation. So, yes, it did change.
>
> Q: The way you did your job changed because you had different people to report to. But what you did didn't change, did it?

A: Well, that's part of what I did.

Q: All right. You ran Continental Car Club and that remained the same?

A: That aspect, yes.

Q: They didn't bring anybody else in to take over your responsibilities for the operations of Continental?

A: No.

Q: Didn't reassign you to work with different customers than the ones you were already working with?

A: No.

Q: And as soon as the business was sold, even though your dad remained kind of in a consulting arrangement, you were the one who was in charge of Continental?

A: Yes.

Thurman testified similarly, stating as follows:

Q: Your responsibilities at Fortegra following Fortegra's purchase of Continental, what were those?

A: Sales and more of a leadership role in the office working with the ladies to fix problems with commissions, claims, or cancellations, and deal with complaints.

Q: Those job duties and responsibilities remained the same throughout your employment?

A: Yes.

Q: No change in title?

A: No.

-14-

Q: No decrease in pay?

A: Nope. No.

*   *   *

Q: When Mr. Short became your immediate supervisor, your job duties didn't change, did they?

A: No, sir.

Based on the above, we reverse the trial court's holding that Dill and Thurman established that they resigned for "Good Reason" as defined and agreed upon in their employment contracts.

## B.

Additionally, we hold that the evidence preponderates in favor of finding that Dill and Thurman are not entitled to severance pay under their employment agreements because they violated the provisions of Section 8 of the agreements. The agreements provide that Dill and Thurman would be entitled to severance pay if they resigned with Good Reason "*as long as the Executive does not violate the provisions of Section 8 and Section 9 hereof.*" (Emphasis added). Section 8 provides as follows:

> Section 8.01. Proprietary Information. In the course of service to the Company, the Executive will have access to confidential specifications, know-how, strategic or technical data, marketing research data, product research and development data, manufacturing techniques, confidential consumer lists, [and] sources of supply and trade secrets, all of which are confidential and may be proprietary and are owned or used by the Company, or any of its subsidiaries or affiliates. Such information shall hereinafter be called "*Proprietary Information*" and shall include any and all items enumerated in the preceding sentence[.]

> Section 8.02. Fiduciary Obligations. The Executive agrees that Proprietary Information is of critical importance to the Company. . . .The Executive agrees that he shall keep all

-15-

Proprietary Information in a fiduciary capacity for the sole benefit of the Company.

Section 8.03. <u>Non-Use and Non-Disclosure</u>. The Executive shall not during the Term or at any time thereafter (a) disclose, directly or indirectly, any Proprietary Information to any person other than the Company or Executives thereof . . . or (b) use any Proprietary Information, directly or indirectly, for his own benefit or for the benefit of any other person or entity. At the termination of his employment, the Executive shall deliver to the Company all notes, letters, documents and records which may contain Proprietary Information which are then in his possession or control and shall destroy any and all copies and summaries thereof.

\*　　\*　　\*

Section 8.05. <u>Return of Documents</u>. All notes, letters, documents, records, tapes and other media of every kind and description relating to the business, present or otherwise, of the Company or its affiliates and any copies . . . shall be the sole and exclusive property of the Company. The Executive shall safeguard all Documents and shall surrender to the Company at the time his employment terminates, . . . all Documents then in the Executive's possession or control.

(Underlining in original.)

Both Dill and Thurman candidly admitted that they intended to go into business together running a competing car club as soon as their resignations were effective. Dill stated, "I planned on starting another car club, going back into business as a car club in the same industry, in the same niche." When Dill was asked what "Freedom Car Club" was, he responded, "that's a name I reserved on the internet for what I thought might be a good name for another car club." Thurman hired VOLState to register two internet domain names for him and Dill – "freedomcarclub.com" and freedomroadclub.com." When Thurman was asked on what date he "obtain[ed] the website for Freedom Car Club," he recalled it was on July 25 or 26 of 2011, a few days before they resigned. However, David Snyder, who runs VOLState, testified that he registered the domain name "freedomcarclub.com" on March 16, 2011. He didn't remember exactly when Thurman asked him to do it, but stated that it had

to have been before the middle of March – over *three months* before Dill and Thurman quit.

As already noted, shortly before sending their resignation letters, Dill and Thurman copied all of the data from their Fortegra-owned work computers to recently purchased personal laptops. They did not tell anyone at Fortegra they had done this. After it became clear that Fortegra was not going to persuade them to change their minds and stay, Dill and Thurman were asked to return all company property. They did not mention or return the copied computer data. They testified that they copied the data for only two reasons – because some of it was personal and in anticipation of possible litigation. Thurman further testified as follows:

> Q: You understand that you were obligated to return all company documents and materials back to Fortegra; correct?
>
> A: Yes.
>
> Q: And yet you walked out the door with all the information contained on your work computer?
>
> A: That is correct, yes.
>
> Q: Contained financial information belonging to the company?
>
> A: I would assume, yes.
>
> Q: Some of those financial documents had every single customer and client of Continental Car Club?
>
> A: I can't say that I had a listing of every single customer of Continental on my computer. I –
>
> Q: Had one of the all company reports that identifies sales, claims, and commissions that we looked at under tab 54 earlier that contains the entire client list of clients and customers?
>
> A: My computer's – it's been examined. If it was on there, it was on there. I mean, I – I'm not saying it was not.

*     *     *

Q: That information was transferred over to your Freedom Car Club account; correct?

A: Yes.

In his testimony, Dill stated the following, including his unequivocal admission that he violated Section 8 of his employment agreement:

Q: You copied your entire computer, not just your personal information from the Continental Car Club laptop that you had the day before you resigned?

A: Yes.

*     *     *

Q: Right. Contained – any e-mails that were on the computer got copied?

A: Yes.

Q: All of your Outlook contents got copied?

A: Yes.

Q: Which had names and telephone numbers of customers and clients?

A: Just e-mails, I assume.

Q: [I]t had any documents related to the operation of the business?

A: It had some documents related that were e-mails, the e-mails that were sent from Jacksonville, yes.

Q: Contained financial information about the company?

A: Yes.

Q: Contained the reports off of David O'Neil's system which identifies customer and amount of sales broken down with commissions that are paid on each of these customers that are generated on a monthly basis?

A: Yes.

Q: Contained copies of the agreements that you use in order to sell the car club?

A: I don't recall.

Q: And at the time you walked out with that information, you were prepared to start up a new car club; correct?

A: Yes.

*     *     *

Q: Section 8.05.

A: Return of documents.

Q: Return of documents. You understood, then, at the time you signed the agreement that you had an obligation at the end of your employment to return all documents belonging to the company and related to its business?

A: Yes.

*     *     *

Q: *And when you took the information off of your computer, you violated that section; correct?*

A: Yes.

Based on the foregoing, we reverse the trial court's award of severance pay to Dill and Thurman, because, in addition to failing to establish a "Good Reason" to resign as defined in the employment agreements, they violated Section 8 of the agreements.

-19-

V.

We now turn to the issue of the enforceability of the non-compete provision of the employment agreements. As a preliminary matter, we must determine whether Florida law or Tennessee law applies. Although the agreements contain a choice-of-law provision that designates Florida law, Dill and Thurman argue that Florida law regarding the interpretation and enforcement of non-compete covenants is contrary to public policy in Tennessee. We agree with Dill and Thurman. We have observed that " 'Tennessee will honor a choice of law clause if the state whose law is chosen bears a reasonable relation to the transaction and absent a violation of the forum state's public policy.' " *Wright v. Rains*, 106 S.W.3d 678, 681 (Tenn. Ct. App. 2003) (quoting *Bright v. Spaghetti Warehouse, Inc.*, No. 03A01-9708-CV-00377, 1998 WL 205757 at *5 (Tenn. Ct. App. E.S., filed Apr. 29, 1998)). Resolution of the question of whether applying Florida law would violate Tennessee public policy requires an examination of the law of each state.

In *Murfreesboro Med. Clinic, P.A. v. Udom*, 166 S.W.3d at 678, the Tennessee Supreme Court's most recent decision interpreting a non-compete agreement, our High Court reiterated the following principles:

> In general, covenants not to compete are disfavored in Tennessee. *See Hasty v. Rent-A-Driver, Inc.,* 671 S.W.2d 471, 472 (Tenn. 1984). *These covenants are viewed as a restraint of trade, and as such, are construed strictly in favor of the employee. Id.* However, if there is a legitimate business interest to be protected and the time and territorial limitations are reasonable then non-compete agreements are enforceable. *Id.* at 473. Factors relevant to whether a covenant is reasonable include: (1) the consideration supporting the covenant; (2) the threatened danger to the employer in the absence of the covenant; (3) *the economic hardship imposed on the employee by the covenant*; and (4) whether the covenant is inimical to the public interest. *Id.* at 472-73 (citing *Allright Auto Parks, Inc. v. Berry*, 219 Tenn. 280, 409 S.W.2d 361, 363 (1966)). Also, the time and territorial limits must be no greater than necessary to protect the business interest of the employer. *Allright Auto Parks*, 409 S.W.2d at 363.

(Emphasis added.) Numerous Tennessee appellate decisions have restated and applied the rule that covenants not to compete "are construed strictly in favor of the employee." *See, e.g., Hasty*, 671 S.W.2d at 472; *Vantage Tech.*, 17 S.W.3d at 644. Further, in Tennessee,

"the economic hardship imposed on the employee by the covenant" not to compete must be considered, and can be an important factor, in determining whether the covenant will be deemed reasonable and enforced. *Udom*, 166 S.W.3d at 678; *Columbus Med. Servs.*, 308 S.W.3d at 391 (examining hardship on former employee and stating, "[r]espectfully, in evaluating the reasonableness and enforceability of the Therapist Defendants' non-compete covenants, the trial court's analysis of the hardship to the employees should have ended with its conclusion that the burden on the Therapist Defendants was 'difficult' or 'intolerable.' ").

In Florida, unlike Tennessee, the interpretation of a covenant not to compete is primarily governed by statute. Florida Statutes Annotated Section 542.335(1) provides the following in pertinent part:

> (g) In determining the enforceability of a restrictive covenant, a court:
>
> 1. *Shall not consider any individualized economic or other hardship that might be caused to the person against whom enforcement is sought.*
>
> \* \* \*
>
> (h) *A court shall construe a restrictive covenant in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement. A court shall not employ any rule of contract construction that requires the court to construe a restrictive covenant narrowly, against the restraint, or against the drafter of the contract.*

(Emphasis added). An examination of Florida's statutory scheme reveals that, although there are similarities, it differs from Tennessee law in two significant ways: (1) it requires construction in favor of the former employer seeking to enforce the covenant not to compete, as contrasted with the law in Tennessee requiring strict construction in favor of the former employee; and (2) it bars the court from considering hardship that might be caused to the employee by enforcement of the covenant not to compete. We conclude that Tennessee law applies to the issue of the enforceability of the non-competition provisions of the employment agreements. Courts in other jurisdictions considering this issue have reached a similar conclusion. *See Southwest Stainless, L.P. v Sappington*, No. 07-CV-0334-CVE-PJC, 2008 WL 918706 at \*4, \*6 (N.D.Okla., filed Apr. 1, 2008) (applying Oklahoma rather than Florida law based on conclusion that "the application of Florida law contravenes Oklahoma public policy" regarding interpretation of restrictive covenant not to compete);

-21-

***Hostetler v. Answerthink, Inc.***, 599 S.E.2d 271, 274-75 (Ga. Ct. App. 2003) (applying Georgia law to restrictive covenant not to compete despite Florida choice-of-law provision).

In determining whether, under Tennessee law, a former employer has "a legitimate business interest to be protected," ***Udom***, 166 S.W.3d at 678, this Court has provided the following analytical framework:

> Several principles guide the determination of whether an employer has a business interest properly protectable by a non-competition covenant. Because an employer may not restrain ordinary competition, it must show the existence of special facts over and above ordinary competition. [***Hasty***, 671 S.W.2d at 473.] These facts must be such that without the covenant, the employee would gain an unfair advantage in future competition with the employer. ***Id.*** Considerations in determining whether an employee would have such an unfair advantage include (1) whether the employer provided the employee with specialized training; (2) whether the employee is given access to trade or business secrets or other confidential information; and (3) whether the employer's customers tend to associate the employer's business with the employee due to the employee's repeated contacts with the customers on behalf of the employer. ***Id.*** These considerations may operate individually or in tandem to give rise to a properly protectable business interest. *See, e.g.*, ***AmeriGas Propane, Inc. v. Crook***, 844 F.Supp. 379 (M.D. Tenn. 1993); ***Flying Colors of Nashville, Inc. v. Keyt***, C/A No. 01A01-9103-CH-00088, 1991 WL 153198 (Tenn. App. M.S., filed August 14, 1991).
>
> An employer does not have a protectable interest in the *general* knowledge and skill of an employee. ***Hasty***, 671 S.W.2d at 473. This is not only true of knowledge and skill brought into the employment relationship, but also true as to that acquired during the employment relationship, even if the employee obtained such general knowledge and skill through expensive training. *See **Hasty***, 671 S.W.2d at 473 ("general knowledge and skill appertain exclusively to the employee, even if acquired with expensive training and thus does not constitute a protectible [sic] interest of the employer").

In contrast, an employer may have a protectable interest in the *unique* knowledge and skill that an employee receives through special training by his employer, at least when such training is present along with other factors tending to show a protectable interest. *Id.*; *Selox, Inc. v. Ford*, 675 S.W.2d 474, 476 (Tenn. 1984) ("A line must be drawn between the general skills and knowledge of the trade and information that is peculiar to the employer's business.") (quoting RESTATEMENT (SECOND) OF CONTRACTS § 188 cmt. g (1981)). *See also Flying Colors of Nashville*, 1991 WL 153198 at *5 (holding that training in specialized techniques and processes of paint-mixing, together with a special relationship with the employer's customers, gives rise to a properly protectable interest).

Thus, whether an employer has a protectable interest in its investment in training an employee depends on whether the skill acquired as a result of that training is sufficiently special as to make a competing use of it by the employee unfair.

An employer has a legitimate business interest in keeping its former employees from using the former employer's trade or business secrets or other confidential information in competition against the former employer. *Hasty*, 671 S.W.2d at 473. A trade secret is defined as any secret "formula, process, pattern, device or compilation of information that is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not use it." *Hickory Specialties, Inc. v. B & L Labs., Inc.*, 592 S.W.2d 583, 586 (Tenn. App. 1979) (*quoting Allis-Chalmers Mfg. Co. v. Continental Aviation & Eng'g Corp.*, 255 F.Supp. 645, 653 (E.D. Mich. 1966)). The subject matter of a trade secret must be secret and not well known or easily ascertainable. *Hickory Specialties*, 592 S.W.2d at 587.

What constitutes "confidential information" is somewhat less clear. In *Heyer-Jordan & Assocs., Inc. v. Jordan*, 801 S.W.2d 814 (Tenn. App. 1990), we held that the identities of the employer's customers did not amount to "confidential business information" within the meaning of the employment agreement because such information was generally available in the trade.

We reasoned that "confidential information" is analogous to "trade secret" and that, because customer identities are not secret, they cannot be considered confidential. *See also* ***Amarr Co. v. Depew***, C/A No. 03A01-9511-CH-00412, 1996 WL 600330, *4-*5 (Tenn. App. W.S., filed October 16, 1996) (holding that customer lists, customer credit information, pricing information, and profit and loss statements did not constitute confidential information because such information is easily available from sources other than the employer).

An employer may also have a legitimate protectable interest in the relationships between its employees and its customers. *See* ***Hasty***, 671 S.W.2d at 473. It is often the case that the customer associates the employer's business with the employee due to the employee's repeated contacts with the customer. The employee in essence becomes "the face" of the employer. This relationship is based on the employer's goodwill. The employee's role in this relationship is merely that of the employer's agent. In this role, the employee is made privy to certain information that is personal, if not technically confidential. Because this relationship arises out of the employer's goodwill, the employer has a legitimate interest in keeping the employee from using this relationship, or the information that flows through it, for his own benefit. This is especially true if this special relationship exists along with the elements of confidential information and/or specialized training.

***Vantage Tech.***, 17 S.W.3d at 644-46 (emphasis in original; paragraph headings omitted).

The employment agreements at issue here provide as follows:

Section 9.01. <u>Acknowledgments.</u> The Executive and Company agree that he is being employed hereunder in a key capacity with the Company and that the Company is engaged in a highly competitive business and that the success of the Company's business in the marketplace depends upon its goodwill and reputation for quality and dependability. . . .

Section 9.02. <u>General Restrictions.</u> During the Term and for the Non-Competition Period . . . the Executive will not (anywhere

in the United States where the Company or any of its subsidiaries then conducts business) engage or participate in, directly or indirectly, as principal, agent, employee, employer, consultant, investor or partner, or assist in the management of, or provide advisory or other services to . . . any business which is Competitive with the Company. . . . [A] business shall be considered "*Competitive with the Company*" only if it offers products or provides marketing, distribution, administration or related products and services for automobile club membership plans to financial institutions or other entities or otherwise engages in any other business the Company and/or its subsidiaries are engaged in or have taken steps to be engaged in prior to the Executive's termination of employment.

\* \* \*

For purposes of this Agreement, the "*Non-Competition Period*" shall mean the longer of (i) the Term and (ii) a period of twenty-four (24) consecutive months after the Executive's employment terminates and (iii) the period during which the Company is paying any amounts to the Executive hereunder or otherwise providing benefits to the Executive.

(Underlining and italics in original.) The agreements further provide for a similar 24-month non-solicitation period requiring that Dill and Thurman, after termination of employment, will not "call upon, solicit, divert or attempt to solicit or divert from the Company or any of its affiliates or subsidiaries any of their customers, agents or suppliers, or potential customers, agents or suppliers."

Fortegra does not argue that it provided Dill and Thurman with specialized training during the approximately fourteen months they worked there. Dill and Thurman were already effectively running Continental before Fortegra bought it, and presumably already had sufficient training and experience to do what Fortegra hired them to do – essentially continue to run and expand Continental. Fortegra argues that the second and third *Vantage Tech* factors apply to provide them a legitimate protectable business interest. Specifically, Fortegra asserts that Dill and Thurman were given access to trade or business secrets or other confidential information; and that Continental/Fortegra's customers tend to specifically associate their business with Dill and Thurman due to their repeated contacts and relationships with the customers on Continental's behalf. We agree. The evidence in the

record fully supports Fortegra's argument that it had a legitimate business interest that was protectable by a covenant not to compete.

All the witnesses at trial testified that the non-compete agreements were essential to the sale of Continental to Fortegra. Fortegra would not have bought the company without them. Several witnesses testified that the reason for this is that what Fortegra was primarily buying was the personal customer relationships and attendant goodwill built and established primarily by Dill and Thurman. Dill testified that he and Thurman personally knew every significant customer of Continental. Mike Vrban, Fortegra's senior vice president of financial operations, testified that of the $11.9 million purchase price, $11.829 million was categorized as "goodwill," and further stated:

> Q: Can you explain why $11.829 million was listed as good will?
>
> A: Because there were no tangible assets to the company per se.
>
> Q: So what does that represent?
>
> A: So what that would represent is obviously the value of what we would place upon the earning stream that would come forward which is obviously the relationships of the clients, making sure that we do not have people who can compete with us and take the business away, that's really what this reflects.

Vrban testified that under applicable accounting rules, $6.4 million of the purchase was ultimately designated "intangible assets" related to goodwill, existing customer relationships and the non-compete agreements. Vrban explained that they had to have the non-compete agreements because without them, "they have the ability basically to sell us a business that they can then just take away from us." Dale Bullard stated that "this is very much a relationship business" and further testified that

> typically there's someone who is so critical to the business that you say I'm only going to buy this business if certain people continue to be here and sign an employment agreement that includes non-compete language . . .
>
> Q: And why does that matter?

A: Because if you didn't have that, I mean, they could leave tomorrow and virtually clean out everything you just bought. . . . Essentially they hang a shingle, be in business, and in this business take a very significant portion of what you just bought.

Dill testified that he understood the importance and significance of the non-competes to the deal, stating:

Q: At the time Fortegra purchased you, you understood that the reason that your signing employment agreements with him was important is because you had been the one running the business?

A: Yes.

Q: And then if you left, you would be able to go out and take all of the clients away from this business that Fortegra had just purchased?

A: Yes. There was that potential.

*        *        *

Q: You knew that if you were to not go with Fortegra and you set up your own car club, you could get a lot of these customers to come over with you because you had that relationship?

A: Potentially.

Q: And the non-compete was to make sure that that didn't happen?

A: Yes.

Q: I believe from when we talked in October there wasn't a significant client of Continental Car Club that you didn't know personally?

A: Yes.

Regarding business secrets or confidential information, John Short testified as follows:

> The commission structure for selling Continental Car Club or – like I say, they're almost all custom built. One customer we have one commission rate. Another has a different rate. One gets paid a commission that all goes to the central office. One gets paid a commission, you know, a part goes to every employee at the account that sold it. Some go to the branch manager and some go to central company. So very complicated, unique. . . .
>
> Q: What effect would that information have or what competitive advantage would a competitor gain if they came into possession of that information?
>
> A: Well, it would give them immediate ability to know what our pricing is, try and attack it, underbid the pricing, and it would be – that's what everyone is trying to find out. . . .
>
> Q: So this is information that Fortegra holds closely as confidential?
>
> A: Absolutely.
>
> Q: And both Mr. Dill and Mr. Thurman had access to all of that information?
>
> A: I would say in large part they helped create it.

Dill and Thurman had access to customer lists of both Continental and United after Fortegra's purchase of United. We have observed that " 'it has long been settled that *present* customers are a protectable interest of an employer.' " ***Money & Tax Help, Inc. v. Moody***, 180 S.W.3d 561, 565 (Tenn. Ct. App. 2005) (quoting ***Thompson, Breeding, Dunn, Creswell & Sparks v. Bowlin***, 765 S.W.2d 743, 745 (Tenn. Ct. App. 1987)) (emphasis in original). Based on the evidence, we have no hesitancy in affirming the trial court's ruling that Fortegra had a legitimate business interest that was protectable by a covenant not to compete.

We further hold that the terms of the non-compete agreements signed by Dill and Thurman are reasonable as to time and geographic constraints. "The inquiry as to

-28-

reasonableness under the circumstances is a fact-specific one, and there is no inflexible formula for determining reasonableness; 'each case must stand or fall on its own facts.' " *Moody*, 180 S.W.3d at 565 (quoting *Allright Auto Parks*, 409 S.W.2d at 363)). Applying the factors outlined in *Udom*, we note that Dill and Thurman do not argue that there was insufficient consideration supporting the covenant, or that the covenant is inimical to the public interest. The proof establishes that the threatened danger to Fortegra in the absence of the covenant is significant. Roughly fourteen months before Dill and Thurman quit, Fortegra paid almost twelve million dollars for Continental, a company with few tangible assets but very valuable customer accounts and relationships. Fortegra stood to lose much of that value very quickly if Dill and Thurman walked away with the customer relationships they had built over two decades, with the intent to compete with Fortegra.

Regarding the economic hardship imposed on Dill and Thurman by the covenant, while it is not insignificant, it is tempered by the fact that they have education, training, and experience at an executive managerial level that will be transferrable to other employment. Further, as reflected in their employment agreements, both Dill and Thurman have been involved in other commercial business ventures that provide potential income.[3] It is also significant to this analysis that Dill and Thurman voluntarily resigned from their employment, despite Fortegra's best efforts to retain them. *See Central Adjustment Bureau, Inc. v. Ingram*, 678 S.W.2d 28, 35 (Tenn. 1984) ("Another factor affecting reasonableness is the circumstances under which an employee leaves.").

We find that the non-compete agreements are overbroad in one respect, however. The agreements provide that Dill and Thurman may not engage or participate in any business "competitive with the company," and further state that "a business shall be considered 'Competitive with the Company' only if it offers products or provides marketing, distribution, administration or related products and services for automobile club membership plans to financial institutions or other entities *or otherwise engages in any other business the Company and/or its subsidiaries are engaged in or have taken steps to be engaged in* prior to the Executive's termination of employment." (Emphasis added.) The record indicates that Fortegra owns numerous subsidiaries that are generally engaged in a broad-ranging spectrum of business endeavors. In its brief, Fortegra cites the above provision and states, "[i]n other words, this section precludes Plaintiffs from establishing a competing car club." This interest – keeping Dill and Thurman from establishing a competing car club – is precisely the interest that is protectable by the non-compete agreement. The italicized language, precluding them

_____

[3]For example, Dill's employment agreement provided that he "may continue his ownership of business interests in the following entities during the term of this Agreement and any severance period: River City Financial, People's Choice Finance, Laurel Financial Group, Inc., Home Town Financial Services, Inc., Herald Print Shop, Inc., Collateral Services Corporation, and Dad's Auto Sales, Inc."

from involvement in "any other business the Company and/or its subsidiaries are engaged in," is overbroad, and we hold it should be elided from the agreements. As modified, the agreements are valid and enforceable.

## VI.

Dill and Thurman argue that the trial court erred in finding in favor of Fortegra on its conversion counterclaim. The trial court ordered Dill and Thurman to return any information belonging to Fortegra that they took by copying all the data from their work computers. The court held that Fortegra did not prove any damages resulting from the conversion, so it did not award Fortegra a judgment other than the injunctive relief. We find no error in the trial court's ruling against Dill and Thurman on the conversion claim, nor in its decision declining to award any monetary damages for the conversion of the computer data. Similarly, we find no error in the trial court's disposition of Fortegra's claim based on the Florida Uniform Trade Secrets Act ("UTSA"), Florida Statutes Annotated Section 688.001 *et seq*. Florida's version of the UTSA provides for injunctive relief for a party who proves misappropriation of a trade secret, stating that "[a]ctual or threatened misappropriation may be enjoined," and "[i]n appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order." Fla. Stat. Ann. § 688.003(1), (3). Although the Florida UTSA further provides for monetary damages, which "can include both the actual loss caused by the misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss," *id.* § 688.004(1), as the trial court held, Fortegra did not prove damages resulting from the taking of its data.

In its counterclaim, Fortegra included a claim for conversion of the value of 20 tickets to a University of Tennessee – LSU football game in October of 2011. Fortegra paid for the tickets. Dill testified that he received them in July and sent them to Continental clients. After he resigned on July 27, 2011, Dill rented a bus in October and took the Continental clients to the football game. Dill did not reimburse Fortegra for the value of the tickets. We hold that Dill is liable to Fortegra for the value of the tickets. At the time he entertained the Continental customers, he was not working for Continental and had not been for several months. Although he testified that he did not actually solicit anyone's business on the trip, at the same time he was hoping and planning to start a competing car club company. On remand, the trial court shall enter a judgment against Dill in the amount of the value of the football tickets.

## VII.

The judgment of the trial court holding the non-competition and non-solicitation provisions valid and enforceable is affirmed as modified. The judgment of the trial court on

the conversion counterclaim in favor of the defendants is affirmed as modified. The trial court's rulings that Dill and Thurman established that they resigned for "Good Reason" as defined in the employment agreements, and that Dill and Thurman did not violate Section 8 of their agreements, are reversed. Consequently, the awards to Dill and Thurman of severance pay and benefits are reversed. Costs on appeal are assessed to the appellees, James F. Dill, Jr., and James C. Thurman, Jr. The case is remanded to the trial court, pursuant to applicable law, for entry of a judgment in accordance with this opinion and for the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., PRESIDING JUDGE